864 So.2d 129 (2004)
Josephine COSTELLO
v.
Ashton R. HARDY, Bradford D. Carey, Hardy and Carey, L.L.P., and XYZ Insurance Company.
No. 2003-C-1146.
Supreme Court of Louisiana.
January 21, 2004.
*133 Betsy J. Barnes, Richard L. Root, Barnes & Root, for Applicant.
Alayne R. Corcoran, Metairie, James H. Daigle, Jr., Henry L. Klein, New Orleans, Richard T. Simmons, Jr., Hailey, McNamara, Hall, Larmann & Papale, Metairie, for Respondent.
WEIMER, Justice.
This litigation originated as a suit alleging legal malpractice. The plaintiff alleged that the defendant attorneys failed to properly draft the will of plaintiff's late son to reflect the son's desire to provide his 85-year-old mother with $25,000.00 per year for living expenses. Defendants answered and asserted a reconventional demand seeking damages for abuse of process and for allegedly defamatory statements in the plaintiff's petition. The trial court granted a motion for partial summary judgment on the legal malpractice claim, dismissing plaintiff's claims against the attorneys and their law firm with prejudice. Following a trial on the merits of the reconventional demand, the trial court found in favor of the defendants on the defamation claim and awarded the attorneys damages totaling $60,000.00. The court of appeal affirmed, finding no error in the rulings of the trial court. We granted certiorari primarily to address the propriety of the award of damages for defamation. Finding that the evidence fails to establish the element of malice, or fault, and that the trial court erred in its determination to the contrary, we reverse the judgment awarding damages for defamation. In all other respects, the judgments below are affirmed.

FACTS AND PROCEDURAL HISTORY
In January 1997, Joseph Costello, a successful businessman with considerable holdings in the communications industry,[1] found himself in deteriorating health. He contacted his longtime attorney and friend, Ashton Hardy, and requested that Hardy draft his will. Costello, who was unmarried and had no children, wished to leave the bulk of his estate to Loyola University. Hardy contacted the Director of Planned Giving at Loyola, Robert Gross, and together Hardy and Gross met with Costello to discuss the disposition of his estate. Hardy's office then prepared an initial draft of the will. That draft was subsequently revised to include a specific bequest to Costello's elderly mother, Josephine Costello, granting her the usufruct of Costello's home for the remainder of her life.
On the morning of March 5, 1997, Hardy received a telephone call from Costello who informed him about surgery scheduled the next day and concerns related to the risks associated with undergoing general anesthesia, which prompted a wish to finalize his will that day. The will was signed on the afternoon of March 5. At the time of signing, it was contemplated that revisions might be necessary to complete some unresolved estate planning issues. One of those issues was Costello's desire to provide his mother with an annual income of $25,000.00 should he pre-decease her. Discussions between Hardy and Gross as to the best method of accomplishing this goal, as well as how to accomplish other estate planning goals, ensued over the next few weeks. Apparently, Costello was concerned *134 that any bequest to his mother not disqualify her from receiving federal benefits in the event she should find it necessary to enter a nursing home.
Costello, Hardy, and tax attorney Michael Mayhall scheduled a meeting for April 8, 1997, to discuss the will, the best method of effectuating the stipend to Costello's mother, and various tax issues. Unfortunately, Costello was hospitalized that day. He remained in the hospital until his death on April 23, 1997. At the time of Costello's death, no document existed, testamentary or otherwise, that guaranteed his mother the $25,000.00 annual income Costello desired her to receive.
Costello was survived by his mother and three brothers, who were incensed by the terms of Costello's will and the substantial bequest to Loyola. The family was particularly aggrieved over the lack of any meaningful provision for Costello's mother.
On July 8, 1997, a "Petition to Annul and/or Declare Invalid the Probated Testament of Joseph M. Costello, III" was filed in the Succession of Joseph M. Costello, III, in the Civil District Court for the Parish of Orleans, naming as defendants the co-executors, Ashton R. Hardy and Michael Costello; and legatees, The Mary Joseph Residence for the Elderly, Loyola University, Aloma Powell, and the Greater New Orleans Foundation (collectively "Succession"). The petition, filed on behalf of Josephine, Martin, and Donald Costello, alleged that the will was invalid because Costello was of unsound mind and body; was acting under duress, fraud or mistake; and/or lacked testamentary capacity at the time he signed the will. The Costello petitioners were represented in this litigation by attorney James Minge.
During the course of discovery in the nullity proceeding, numerous documents were produced. Among the documents was a letter, dated February 26, 1997, from Hardy to Loyola's Gross stating:
As promised, I am enclosing herewith a copy of the latest draft of the Last Will and Testament that I prepared for Joe Costello. During my conference with him, he indicated that he wanted to ensure that his mother received an annual income of $25,000.00 during her lifetime, should she survive him. How do you propose that we deal with that issue[?]
A second letter, dated March 7, 1997, was also produced. This letter, addressed to Hardy and authored by Gross, states in part:
One of Joe's concerns when we were talking before the reading of the will was that the will be "iron clad." He is worried about a family attack on the will, as happened in his father's succession.
....
Joe is also concerned about providing his mother with $25,000 annually of income. A "special needs" Charitable Remainder Trust of a sufficient size could be established for this purpose. If the remainderman of this trust was Loyola, it would not be necessary to change the will, i.e. the cash bequest to Greater New Orleans Foundation.
On the basis of these documents, and others (including one transmitting to Hardy suggested language for including the bequest to Mrs. Costello in a revision of Costello's will), Minge advised the Costello family that, should the will be found to be valid, Mrs. Costello, as a legatee and third party beneficiary under the will, had a potential cause of action against Hardy for negligence in the drafting of the will. Minge referred the Costellos to attorney Richard Root for further investigation of this potential claim.
*135 On April 18, 1998, with the one year anniversary of Costello's death approaching, Josephine Costello, through attorney Root, filed a petition for damages in the Twenty Fourth Judicial District Court for the Parish of Jefferson. The petition named as defendants Ashton R. Hardy, Bradford D. Carey, and the law firm of Hardy and Carey, L.L.P.; it alleged that Hardy failed to properly draft or amend Joseph Costello's will to include the bequest of $25,000.00 annually to Josephine Costello and that such conduct fell below the standard of care of competent practitioners in the same field and locality.[2] As a result, the allegations continued, Mrs. Costello was deprived of living expenses, leaving her unable to support herself in the residence over which she was granted usufruct.
Shortly after the institution of the legal malpractice action in Jefferson Parish, the Costello family settled the nullity action in Orleans Parish. Specifically, the Costellos dismissed their challenge to the will, acknowledging the validity of that document and of all of the legacies outlined therein, in exchange for the Succession's agreement to provide Josephine Costello with a $25,000.00 annual stipend from her late son's estate. The terms of the settlement were read into the record on June 17, 1998, and finalized in a "Petition for Authority to Compromise Claim" filed on October 20, 1998.
In the interim, the defendants in the Jefferson Parish malpractice action filed an exception of no cause of action, asserting that they did not have an attorneyclient relationship with Mrs. Costello and, therefore, owed no duty to her in connection with the drafting of her late son's will. The trial court granted the no cause of action exception, dismissing Mrs. Costello's suit. Mrs. Costello appealed. In an opinion not designated for publication, the court of appeal reversed, finding that as a legatee and third party beneficiary under the will, Mrs. Costello stated a cause of action in negligence against Hardy for his failure either to include a provision in the will for her living expenses or to prepare a codicil providing for living expenses. Costello v. Hardy, 98-1320 (La.App. 5 Cir. 4/27/99) 738 So.2d 210.[3]
The case was remanded to the trial court where defendants filed an answer and reconventional demand seeking damages for abuse of process and defamation arising out of the allegations of malpractice in Mrs. Costello's petition.[4] Thereafter, the defendants filed a motion for partial summary judgment on the malpractice claim. Finding no genuine issue of material fact, the trial court granted summary judgment in favor of defendants, dismissing Mrs. Costello's claim. Mrs. Costello again appealed. The court of appeal dismissed that appeal as premature because the judgment was a partial summary judgment that was not "designated as a final judgment by the court after an express determination that there is no just reason for delay" pursuant to LSA-C.C.P. art. *136 1915(B) and the defendant's reconventional demand was still pending. Costello v. Hardy, 01-583 (La.App. 5 Cir. 1/15/02), 807 So.2d 950.
The case was returned to the trial court where a bench trial was conducted on the reconventional demand. Following the close of evidence, the trial court ruled in favor of Ashton R. Hardy and the law firm of Hardy and Carey, L.L.P. on the defamation claim. The court concluded that Mrs. Costello lacked probable cause to bring the malpractice action, finding "no evidence whatsoever to support the allegation that Mr. Costello wanted anything different than what he got when he executed his will on March 5, 1997," and that although Mr. Costello desired that his mother be taken care of financially, he simply ran out of time to accomplish this task prior to his demise. Based on deposition testimony from Mrs. Costello that the malpractice action was "plan B" for obtaining the $25,000.00 stipend in the event the attack on the will failed, the court found "motivation on behalf of Ms. Josephine Costello to be abusive, to be reckless and as implemented to be frivolous."[5] For the defamation, the court awarded $10,000.00 in damages to the law firm, Hardy and Carey, L.L.P., representing the deductible under the firm's policy of malpractice insurance. Hardy was awarded damages totaling $50,000.00 for mental anguish and personal suffering. The trial court found no evidence to support any loss of business or business reputation and denied a claim for escalating insurance premiums as being too speculative. The claim for abuse of process asserted by Hardy and the law firm was likewise rejected. Judgment was rendered accordingly. Mrs. Costello appealed the judgment awarding damages for defamation, as well as the partial summary judgment in favor of defendants Hardy and Hardy and Carey, L.L.P. on her malpractice claim.[6]
The Court of Appeal, Fifth Circuit rendered its opinion in this matter on March 25, 2003. Costello v. Hardy, 02-1156 (La. App. 5 Cir. 3/25/03), 844 So.2d 212. That opinion affirmed the judgment of the trial court in its entirety. With respect to the summary judgment in favor of defendants Hardy and Hardy and Carey, L.L.P., the court of appeal noted that in order to prevail on her malpractice claim, Mrs. Costello had to establish three elements: 1) the existence of an attorney-client relationship; 2) negligent representation by the attorney; and 3) damages caused by the negligence. The court of appeal held that Mrs. Costello failed to establish the existence of any of these three elements. She failed to establish the existence of an attorney-client relationship; she failed to prove that Hardy was negligent in his representation of her son, Joseph Costello; and she failed to prove that she sustained any damages as a result of the alleged malpractice, having reached a settlement in the Orleans Parish lawsuit that provided her with the $25,000.00 annual stipend that she alleged was omitted from the will. The court of appeal, therefore, affirmed the trial court's determination that there were no genuine issues of material fact and that summary judgment was appropriate as to the malpractice claim.
The court of appeal likewise affirmed the award of damages for defamation. The court found that the malpractice claim *137 brought by Mrs. Costello was frivolous and had no merit; that Mrs. Costello filed the suit, which constitutes a publication; that the suit contained defamatory words aimed at harming Hardy's reputation as an attorney; that the claims were false and Mrs. Costello knew this, but had other motives; and that Hardy suffered personal injuries as a result of the defamation. The court of appeal found the damage awards to be reasonable. Finally, the court affirmed the trial court's determination that plaintiffs-in-reconvention failed to satisfy their burden of proving an abuse of process.
We granted certiorari primarily to address the defamation claim and Mrs. Costello's contention that the trial court erred in determining that the evidence adduced at trial supports an award of damages for defamation. Costello v. Hardy, 03-1146 (La.6/27/03), 847 So.2d 1281.

LAW AND DISCUSSION

Summary Judgment
Before reaching the defamation claim, we must first determine whether summary judgment was properly granted in favor of defendants on Mrs. Costello's main demand, the legal malpractice claim.
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991). A court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." LSA-C.C.P. art. 966(B). Pursuant to a 1996 amendment to the summary judgment article, the summary judgment procedure is now favored under our law. LSA-C.C.P. art. 966(A)(2).
In 1997, the legislature enacted LSA C.C.P. art. 966(C)(2), which clarifies the burden of proof in summary judgment proceedings, providing:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
This court has explained the effect of the 1997 amendment as follows:
This amendment, which closely parallels the language of Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), first places the burden of producing evidence at the hearing on the motion for summary judgment on the mover (normally the defendant), who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case. At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial. Once the motion for summary judgment has been properly supported by the moving party, the failure *138 of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. [Citations omitted.]
Babin v. Winn-Dixie Louisiana, Inc., XXXX-XXXX, p. 4 (La.6/30/00), 764 So.2d 37, 39-40.
To establish a claim for legal malpractice, a plaintiff must prove: 1) the existence of an attorney-client relationship; 2) negligent representation by the attorney; and 3) loss caused by that negligence. Finkelstein v. Collier, 636 So.2d 1053, 1058 (La.App. 5 Cir.1994); Barnett v. Sethi, 608 So.2d 1011, 1014 (La.App. 4 Cir.1992), writs denied, 613 So.2d 993, 994 (La.1993). A plaintiff can have no greater rights against attorneys for the negligent handling of a claim than are available in the underlying claim. See, e.g., Spellman v. Bizal, 99-0723, p. 11 (La.App. 4 Cir. 3/1/00), 755 So.2d 1013, 1019; Couture v. Guillory, 97-2796, p. 7 (La.App. 4 Cir. 4/15/98), 713 So.2d 528, 532, writ denied, 98-1323 (La.6/26/98), 719 So.2d 1287. In the instant case, the court of appeal determined that Mrs. Costello could not establish any of the elements essential to her cause of action and affirmed the trial court's grant of summary judgment.[7]
Despite Mrs. Costello's argument to the contrary, we find defendants have established that summary judgment was proper as to the third element of Mrs. Costello's legal malpractice claim: proof of loss, or damages.
Mrs. Costello's petition asserts that as a consequence of Hardy's alleged negligence in the drafting of the will, she was "deprived [of] living expenses in the amount of twenty-five thousand dollars a year for her life" and suffered "extreme emotional distress" upon being left the usufruct of her late son's home, but no money to support herself or maintain that home. In support of their motion for summary judgment, defendants produced a copy of a "Petition for Authority to Compromise Claim" filed in connection with the Civil District Court proceeding challenging the validity of Costello's will. That petition recites the terms of the settlement reached by the parties to that proceeding: in exchange for dismissing the action to annul Costello's will, a charitable remainder annuity trust would be established to provide a life annuity of $25,000.00 per year to Mrs. Costello with the Greater New Orleans Foundation as trustee and charitable beneficiary. Defendants also produced a copy of the trust document submitted to the court for approval in connection with the settlement. Through these documents, defendants established that Mrs. *139 Costello secured from the Succession the $25,0000.00 annual stipend she claims to have been deprived of by Hardy's alleged malpractice. At this point in the proceedings, the burden shifted to Mrs. Costello to produce factual support sufficient to establish that she will be able to satisfy her evidentiary burden at trial of proving damages sustained as a result of Hardy's alleged malpractice.
Mrs. Costello failed to produce any factual support for her damage claim. No evidence of mental anguish or emotional distress was offered. As to other damages, Mrs. Costello merely argued in brief that she has yet to receive any of the funds to which she is entitled under the settlement [8] and that "being paid five years late in one lump sum is not the same as being paid once a year for the last five years."[9] Such unsupported allegations are insufficient to sustain Mrs. Costello's burden. The undisputed fact remains that her claim against her late son's succession for the $25,000.00 per year stipend that was intended but allegedly omitted from his will has been compromised and discharged in the suit to annul the will. Because Mrs. Costello asserts claims for damages against the attorneys in this malpractice action that were discharged in the settlement of the suit against the Succession, the defendants are entitled to judgment as a matter of law dismissing the plaintiff's malpractice claim.
In conclusion, we find that defendants met their evidentiary burden of showing an absence of factual support for an essential element of plaintiff's claim: loss or damages. Mrs. Costello failed to produce factual support sufficient to establish that she will be able to satisfy her evidentiary burden of proof as to this element at trial. Accordingly, the trial court properly granted summary judgment in favor of Hardy and the law firm, and the court of appeal correctly affirmed that summary judgment.

Defamation
Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name. Fitzgerald v. Tucker, 98-2313, p. 10 (La.6/29/99), 737 So.2d 706, 715; Trentecosta v. Beck, 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559; Sassone v. Elder, 626 So.2d 345, 350 (La.1993). "Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." Trentecosta, 96-2388 at 10, 703 So.2d at 559 (citing RESTATEMENT (SECOND) OF TORTS § 558 (1977)). The fault requirement is often set forth in the jurisprudence as malice, actual or implied. See, Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196, 198 (La.1980) (which also considers falsity as a fifth and separate element); 12 WILLIAM E. CRAWFORD, LOUISIANA CIVIL LAW TREATISE: TORT LAW § 17.4 at 312 (2000). Thus, in order to prevail on a defamation claim, a plaintiff must prove "`that the defendant, with actual malice or other fault, published a false statement with defamatory words *140 which caused plaintiff damages.'" Trentecosta, 96-2388 at 10, 703 So.2d at 559 (quoting Sassone, 626 So.2d at 350). If even one of the required elements of the tort is lacking, the cause of action fails. Douglas v. Thomas, 31,470, p. 3 (La.App. 2 Cir. 2/24/99), 728 So.2d 560, 562 writ denied, 99-0835 (La.5/14/99), 741 So.2d 661; Kosmitis v. Bailey, 28,585, p. 2 (La. App. 2 Cir. 12/20/96), 685 So.2d 1177, 1180.
Defamatory words are, by definition, words which tend to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person, or otherwise expose a person to contempt or ridicule. Fitzgerald, 98-2313 at 11, 737 So.2d at 716; Trentecosta, 96-2388 at 10, 703 So.2d at 559 (citing RESTATEMENT (SECOND) OF TORTS § 559 cmt. (e) (1977)). Words which convey an element of personal disgrace, dishonesty, or disrepute are defamatory. Fitzgerald, 98-2313 at 11, 737 So.2d at 716. The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is ultimately a legal question for the court. Sassone, 626 So.2d at 352. The question is answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. Id. To be actionable, the words must be communicated or "published" to someone other than the plaintiff. Kosmitis, 25,585 at 3, 685 So.2d at 1180.
In Louisiana, defamatory words have traditionally been classified into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning.[10]Lemeshewsky v. Dumaine, 464 So.2d 973, 975 (La.App. 4 Cir.1985). Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se. Kosmitis, 28,585 at 4, 685 So.2d at 1180; Lemeshewsky, 464 So.2d at 975; 12 CRAWFORD, LOUISIANA CIVIL LAW TREATISE: TORT LAW § 17.8 at 315. When a plaintiff proves publication of words that are defamatory per se, the elements of falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Kosmitis, 28,585 at 4, 685 So.2d at 1180. The element of injury may also be presumed. Id.[11]
When the words at issue are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, the elements of falsity, malice (or fault) and injury. Kosmitis, 28,585 at 4, 685 So.2d at 1180. In cases involving statements made about a public *141 figure, where constitutional limitations are implicated, a plaintiff must prove actual malice, i.e., that the defendant either knew the statement was false or acted with reckless disregard for the truth. See, Romero v. Thomson Newspapers (Wisconsin), Inc., 94-1105, p. 5 (La.1/17/95), 648 So.2d 866, 869.
The injury resulting from a defamatory statement may include nonpecuniary or general damages such as injury to reputation, personal humiliation, embarrassment and mental anguish even when no special damage such as loss of income is claimed. Kosmitis, 28,585 at 4, 685 So.2d at 1180. Regardless of the type of injury asserted, however, a plaintiff must present competent evidence of the injuries suffered. Id. at 28,585 at 5, 685 So.2d at 1181. A plaintiff must also demonstrate that the defamatory statements were a substantial factor in causing the harm. Id. (citing Taylor v. Town of Arcadia, 519 So.2d 303, 306 (La.App. 2 Cir.), writ denied, 522 So.2d 1097 (La.1988)).
Finally, even when a plaintiff makes a prima facie showing of the essential elements of defamation, recovery may be precluded if the defendant shows either that the statement was true, or that it was protected by a privilege, absolute or qualified. Doe v. Grant, 01-0175, p. 9 (La.App. 4 Cir. 1/29/03), 839 So.2d 408, 416, writ denied, 03-0604 (La.5/2/03), 842 So.2d 1102; Arledge v. Hendricks, 30,588, p. 4 (La.App. 2 Cir. 6/26/98), 715 So.2d 135, 139.
In the instant case, Mrs. Costello complains that the lower courts erred in determining that plaintiffs-in-reconvention satisfied their burden of proving defamation. In particular, she disputes the trial court's finding that the allegations in her malpractice petition were made without reasonable grounds for believing their veracity and, consequently, with malice.
The threshold issue in a defamation action is whether the words complained of are defamatory, i.e., capable of a defamatory meaning. Mrs. Costello's original petition in the malpractice action alleges that Hardy failed to properly draft and/or amend the last will and testament of Joseph Costello to include a requested bequest to Josephine Costello of $25,000.00 per year for the remainder of her life, resulting in plaintiff being deprived of living expenses in that amount. The petition alleges that Hardy's representation "fell below the standard of care of competent practitioners in his same field and in defendant's locality." These allegations do not accuse Hardy of serious unprofessional conduct or extreme departure from professional ethics,[12] but in fact represent a "plain vanilla" allegation of negligence, the bare minimum necessary to state a negligence cause of action. There is no imputation in these words that Hardy lacked integrity or acted unethically. The allegations nevertheless call into question Hardy's skill as an attorney and whether he comported with the appropriate standard of care in drafting Costello's will. Allegations of this kind would tend to diminish Hardy's reputation with respect to his profession. However, they are not the type of words which would by their very nature tend to injure one's professional reputation without considering extrinsic facts or surrounding circumstances. We find, therefore, that the statements in question are defamatory, but not defamatory *142 per se. We likewise find that the statements were published, since any communication to a third party, absent a privilege, absolute or qualified, is considered a publication.[13]
Having established these initial elementspublication of words that are defamatory but not defamatory per seit remained the burden of plaintiffs-in-reconvention to prove the elements of falsity, malice (or fault) and injury.
As to the element of falsity, the evidence demonstrates, and in fact it is undisputed that Costello's intent was to make sure that his mother received $25,000.00 per year for living expenses should he pre-decease her. The only dispute at trial centered upon whether he intended that stipend to be effectuated in the will or by some other estate-planning device. Hardy testified that Costello instructed him to arrange for the stipend outside of the will. According to Hardy, Costello had arranged for his mother to enter a nursing home when she could no longer take care of herself and had made arrangements for her to be divested of all assets by that time. Hardy advised Costello that if his will contained a bequest to his mother of $25,000.00 per year for the remainder of Mrs. Costello's life, that income could disqualify her from receiving federal benefits. According to Hardy, Costello told him to leave the stipend out of the will, but to find a way to make sure that she received the funds. Hardy consulted with Robert Gross of Loyola about possible methods of effectuating Costello's request and also set up a meeting with tax attorney Michael Mayhall to discuss various options, including abandoning all efforts to preserve Mrs. Costello's federal benefits and just revising the will to include the bequest. Unfortunately, the meeting was scheduled for April 8, the day Costello entered the hospital for the last time. At that point, it was too late to *143 secure anything in writing, although efforts to find a way to secure the stipend for Mrs. Costello continued to the day of Costello's death.
The trial court heard this evidence and found Hardy's testimony to be credible. The court concluded that the evidence did not support the allegation "that Mr. Costello wanted anything different than what he got when he executed his will on March 5, 1997," and that while he desired to take care of his mother financially, and was actively engaged in trying to do so, "it wasn't for Mr. Costello to have enough time to implement his wishes and desires." The court was impressed by the fact that Hardy called in experts to help him in his attempts to effectuate Costello's wishes. The court found, in the final analysis, that the allegations of negligence on the part of Hardy could not be established. After reviewing the record in its entirety, we find that the trial court's conclusion in this respect is a reasonable one and not clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Therefore, this finding will not be disturbed.
The next element of the tort of defamation that plaintiffs-in-reconvention were required to establish is malice. It is with respect to this element that we diverge from the lower court's analysis. The trial court concluded that Mrs. Costello lacked probable cause to bring the malpractice action and that her sole motivation for doing so was to "be abusive, reckless and as implemented to be frivolous." We do not find that the record supports this conclusion.
Malice (or fault), for purposes of the tort of defamation, is a lack of reasonable belief in the truth of the statement giving rise to the defamation.[14]Douglas v. Thomas, 31,470, pp. 4-5 (La.App. 2 Cir. 2/24/99), 728 So.2d 560, 563, writ denied, 99-0835 (5/14/99) 741 So.2d 661 (citing Bell v. Rogers, 29,757 (La.App. 2 Cir. 8/20/97), 698 So.2d 749); Cotonio v. Guglielmo, 176 La. 421, 146 So. 11, 13 (1933) ("Malice, arising from the publication of a false and injurious charge, without probable cause for thinking the charge is true, suffices [to sustain the action for libel]."); Steed v. St. Paul's United Methodist Church, 31,521, 31,522, pp. 10-11 (La.App. 2 Cir. 2/24/99), 728 So.2d 931, 940, writ denied, 99-0877 (La.5/7/99), 740 So.2d 1290; Neuberger, Coerver & Goins v. Times Picayune Pub. Co., 597 So.2d 1179, 1182 (La.App. 1 Cir. 1992) (quoting Redmond v. McCool, 582 So.2d 262, 265 (La.App. 1 Cir.1991) ("Only when a statement is found to be made without reasonable grounds for believing it to be true can the person uttering the statement be found to be actuated by malice or ill will."). Malice in this sense is more akin to negligence with respect to the truth than to spite or improper motive.[15]See, RESTATEMENT (SECOND) OF TORTS § 580B (1977) which defines the malice (or fault) necessary to sustain a defamation action as publication by one who "(a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) *144 acts negligently in failing to ascertain them."
Our review of the record in this case convinces us that the element of malice was not proved. The trial court's finding to the contrary was manifestly erroneous.[16]
Several considerations prompt us to conclude that Mrs. Costello did not act with malice, or without probable cause for believing that the charge of malpractice was true. In the first place, the evidence adduced at trial reveals that upon Costello's death, his family was dismayed to learn that the bulk of his sizeable estate had been left to Loyola, and was particularly aggrieved to discover that no substantial provisions had been made for his 85-year-old mother. An action to annul the last will and testament of Joseph Costello was instituted in Civil District Court for the Parish of Orleans. Mrs. Costello enlisted her son, Martin, to act on her behalf with respect to the litigation. During the course of discovery in this litigation, numerous documents were produced. Upon reviewing the documents, the attorney engaged to represent the Costellos in the will challenge, James Minge, advised Martin that, should the will be upheld, Mrs. Costello had a potential cause of action against Hardy for negligence in the drafting of the will. Minge referred Martin to attorney Richard Root for further investigation of this potential claim.
Martin consulted Root and faxed copies of the discovery documents to his office. Following Root's review of the documents and recommendation, Martin retained Root to file suit against Hardy on behalf of his mother. Thus, the evidence reveals that the malpractice suit was not filed until two attorneys reviewed the available documentation (documentation produced by Hardy) and advised Martin that his mother had a colorable claim. There being no allegation that Martin or his mother failed to communicate to the attorneys all the facts they knew or should have known, or that the attorneys were not in good faith, their reliance on the advice of counsel in pursuing this litigation undermines the charge of malice or want of probable cause. See, Eusant v. Unity Industrial Life Ins. & Sick Benefit Ass'n of New Orleans, 195 La. 347, 353, 196 So. 554, 556 (1940) recognizing, albeit in the context of a malicious prosecution action, the wellsettled rule, equally applicable to this case, that "[w]here a party has communicated to his counsel all the facts bearing on the case of which he has knowledge, or could have ascertained by reasonable diligence *145 and inquiry, and has acted upon the advice received honestly and in good faith, the absence of malice is established, the want of probable cause is negatived."
Our own examination of the documents relied upon by Mrs. Costello to support her malpractice claim convinces us that Mrs. Costello had probable cause to believe that something had gone awry and that Hardy had failed to effectuate an intended bequest. The documents include:
1. Hardy's earliest hand-written notes regarding Costello's will. These notes, entitled "Costello(Will and Charit. Trust)," indicate that Costello wished to give Loyola his home with a retained life estate in his mother. The following is noted: "If Joe die before mother = earnings support mother until die."
2. Letter from Hardy to Loyola's Gross dated February 26, 1997(prior to execution of will on March 5,1997). The letter states: "During my conference with [Costello], he indicated that he wanted to ensure that his mother received an annual income of $25,000.00 during her lifetime, should she survive him. How do you propose that we deal with that issue[?]"
3. Note to Costello file from Robert Gross, dated February 27, 1997. Gross states: "Ashton Hardy is concerned that Joe Costello's health is deteriorating rapidly and he wants to get something signed ASAP. He should have a draft to me on February 27th.
Joe Costello is now concerned that he may die before his mother. He wants to make sure that she has something to live on, and it may be as easy as establishing a Charitable Remainder Annuity Trust outside the will for $400,000. This could also be a Testamentary Charitable Remainder Trust established by codicil."
4. Letter from Gross to Hardy dated March 7, 1997. The letter, written after Costello's will was executed, attempts "to summarize some of the additional estate planning items we discussed." It explains: "Joe is also concerned about providing his mother with $25,000 annually of income. A `special needs' Charitable Remainder Trust of a sufficient size could be established for this purpose. If the remainderman of this trust was Loyola, it would not be necessary to change the will, i.e., the cash bequest to the Greater New Orleans Foundation."
5. Letter from Hardy to Michael Mayhall dated April 2, 1997. Hardy indicates to Mayhall that Costello's will was signed on a "semi-emergency" basis and needs a "polish up." Summarizing tax issues that remain to be resolved, Hardy writes:
"We need to make a decision with Joseph as soon as possible in order to do an appropriate codicil to this will.
We might also want to consider establishing a trust for the protection of Joseph's mother should she survive him."
6. Letter from Gross to Hardy, dated April 22, 1997. The letter is captioned: "Joseph M. Costello, III Will: Provision for Mother," and states, in pertinent part: "I have enclosed herein a Specimen Testamentary Provision for a Charitable Gift Annuity that may be included in a revision of Joe's will. This provides that Joe's estate will pay The Greater New Orleans Foundation $350,000 in exchange for a life annuity to Joe's mother. The life annuity will provide $25,000 per year, the amount that Joe had suggested."
*146 Even a cursory review of these documents substantiates the allegation that Mrs. Costello had probable cause to believe that Hardy acted negligently in failing to effectuate the bequest to her. The documents, which are all contemporaneous accounts of the estate planning process, clearly evidence Costello's intent to provide his mother with financial support. They also indicate an awareness that time was of the essence in resolving the matter and that either a revision or codicil to the will was contemplated as a means of effectuating the bequest, but never accomplished.
At trial, Hardy insisted that Costello's specific instructions were that the $25,000.00 stipend to his mother not be included in the will in order to preserve her federal benefits, but not one document in either Hardy's or Gross' files chronicles this instruction. Given the copious notes that Gross prepared and the specific reference in the contemporaneous documents to a testamentary bequest (including the April 22 letter which encloses draft language for including the stipend in a revision to the will), it was not unreasonable for Mrs. Costello to rely on the disclosures in the written record. The fact that, ultimately, she did not prevail in her negligence action does not mean that she lacked probable cause for bringing that action. "Whether or not a litigant has probable cause for the averments of his judicial pleadings does not depend merely upon the actual state of the case, but upon his honest belief in making said averments. He may be mistaken, but if he has reasonable grounds for believing the truth of the allegations, and is not actuated by malice and ill will, no damages are recoverable." Waldo v. Morrison, 220 La. 1006, 1013, 58 So.2d 210, 212 (1952) (quoting Gosserand v. Gumbel, 154 La. 537, 542, 97 So. 852, 854 (1923)). Martin Costello testified at trial that, acting as agent for his mother, he retained Root to bring the malpractice action on her behalf on advice of counsel and after reviewing the discovery documents himself. He expressly denied conspiring with his mother to bring a suit with the intent to harm Hardy, and the record is devoid of any evidence of ill will on the part of either Martin or his mother against Hardy.[17]
At trial, Hardy attempted to prove malice on the part of Mrs. Costello by arguing that he had arranged for her to receive the $25,000.00 annuity outside the will, through an agreement with the Greater New Orleans Foundation; that she had knowledge of this agreement through the documents produced in discovery in the nullity action; and that she filed the malpractice claim anyway, with full knowledge that Hardy had secured for her, outside the will, the stipend her son intended her to have. The record does not support this contention.
*147 Costello's will provided for a bequest of $350,000.00 to the Greater New Orleans Foundation, a foundation that administers investments, to establish an endowment fund for the benefit of eight charities designated in the will. Robert Gross testified that in assisting Hardy with the drafting of Costello's will, he discussed with Hardy two possible avenues of securing the stipend for Mrs. Costello. One method of insuring the stipend was through a codicil to the will; the other was through an inter vivos charitable gift annuity. In late April 1997, suspecting that Costello was very ill and that time was running out, Gross devised an alternative plan for accomplishing the stipend. On the morning of April 22, 1997, the day before Costello died, Gross spoke with Margaret Epstein of the Greater New Orleans Foundation. Their conversation was memorialized in a letter to Hardy of that date. The letter recites: "In a conversation I had with Margaret Epstein at the foundation this morning, she indicated that if the will was not changed, and the executor were to request the foundation to provide a life income plan for Joe Costello's mother with a remainder going to the eight beneficiaries, The Greater New Orleans Foundation would have no problem with that. Especially if this were to `keep peace' in the family and prevent a challenge to the will." At trial, Hardy maintained that this letter, which was provided to the Costellos in discovery in the nullity proceeding, is evidence that Hardy was in fact able to fulfill the desires of Joseph Costello and provide for Costello's mother's living expenses as directed, outside the will. Hardy testified that once Mrs. Costello learned that the stipend was protected by the agreement with the Greater New Orleans Foundation, her decision to proceed with the malpractice action was without probable cause and malicious. The trial court apparently accepted this argument. However, it is not supported by the evidence.
Gross, the only individual who spoke directly to Epstein, testified at trial that he was not sure at the time whether the offer on behalf of the Greater New Orleans Foundation was unqualified or whether it was conditioned upon there being no challenge to the will. If Gross was unsure as to whether the agreement he had procured was unqualified, it was certainly reasonable for Mrs. Costello to discount its efficacy. While it was stipulated at trial that if called to testify, Epstein would have stated that the offer was unconditional, at the time the malpractice suit was filed there was no evidence to suggest that such was the case. Nor, at the time suit was filed, almost one year to the day after Costello's death, had any request been made by Hardy (co-executor of the estate) for the Greater New Orleans Foundation to fund the life-income plan it had allegedly agreed to provide. When asked at trial how he could justify proceeding with the litigation in light of this "agreement," Martin Costello testified that he did not consider the reference in Gross' letter to mean anything; he could not understand how Gross, an employee of Loyola, had authority to negotiate for the estate, or how Epstein could agree to divert funds from legatees named in the will as beneficiaries of the endowment.
Hardy thus failed to prove the allegation that Mrs. Costello knew or should have known that she was going to receive the stipend and proceeded with the malpractice claim anyway. The fact that the nullity suit was later settled and the challenge to the validity of the will dropped in exchange for an agreement establishing the endowment undermines any contention that a binding agreement existed at the time Mrs. Costello's suit was filed.
*148 In conclusion, therefore, we find that the record fails to establish the element of malice and that the trial court was clearly wrong in finding to the contrary. Based on the evidence available to her, in the form of written records produced by Hardy in discovery, Mrs. Costello had a reasonable basis for believing that her allegations of malpractice were true. There is no question but that Joseph Costello intended to provide his mother with living expenses of $25,000.00 per year should he pre-decease her. At the time of his death, there was no document in existence that afforded her this stipend. Confronted with these facts, Mrs. Costello was reasonable to assume that Hardy had negligently failed to fulfill her son's bequest. After receiving advice from two attorneys, she asserted her claim in the least offensive language possible, pleading the bare minimum allegations that would assert a cause of action. While she may not have ultimately prevailed on the merits of her claim, there is no question but that she had a reasonable basis for believing that claim to be true and a reasonable basis for asserting the claim at the time it was brought.[18]

CONCLUSION
Finding that the element of malice was not proved, we reverse the judgments of the court of appeal and the trial court awarding damages for defamation. In all other respects, the judgments of the lower courts are affirmed.
REVERSED IN PART; AFFIRMED IN PART.
JOHNSON, Justice concurs in the result.
KNOLL, Justice, additionally concurs for the assigned reasons.
KNOLL, J., concurring.
I write separately to express my view that while we conclude the record does not support malice by decedent's mother, I find there was malice by decedent's brothers who did more than fully support their mother's position.
The record shows at the signing of his testament Joseph Costello stated he knew his mother, Josephine Costello, and brothers, Martin and Michael Costello, would attack the validity of the will because that is what had occurred when Costello's father died. Martin Costello testified that the Costello family knew several years prior to Joseph's death that he wanted his estate to go to Loyola. Indeed, shortly after Joseph's death, Michael Costello called Mr. Hardy and informed him that the family would not stand for Joseph's testamentary disposition of his estate. Michael proposed that the estate enter into a settlement whereby the Costellos would receive 60% of the estate and Loyola 40%. Otherwise, he threatened to litigate and run up legal costs until the estate was depleted. Michael conveyed a similar message to personnel at Loyola about reaching a settlement and particularly mentioned that he was aggrieved that his mother, Josephine Costello, was not getting more of the estate. Thus, it is abundantly clear that although Joseph Costello *149 wanted the bulk of his estate to be given to Loyola University and his family knew his desires, the Costello family did not want to see that testamentary disposition happen. Notwithstanding the Costello family's actions, Mr. Hardy, armed with the knowledge of what his client's testamentary intentions were, stood firm in the belief that his client wanted the terms of his testament carried out even should his family protest such a disposition. Simply stated, in the face of adversity, Mr. Hardy maintained his fidelity to the magnanimous wishes of his client.[1]
As found in the majority opinion, the trial court properly found Mr. Hardy free of liability in Josephine Costello's legal malpractice claim against him. Although Joseph intended to provide his mother a yearly stipend of $25,000, it is abundantly clear he did not want this provision in his last will and testament. Unfortunately, Joseph died before Mr. Hardy could set up the legal mechanism for Joseph to provide for his mother.
Nevertheless, my reading of the record does not establish the malice on the part of Josephine Costello needed to impose liability on her for defamation. Arguably the notations to the file and various correspondence between Mr. Hardy, Loyola University, and the tax experts provided Josephine Costello with a colorable claim against Mr. Hardy. Notwithstanding, that is not to say the record does not support malice by the decedent's brothers, but they are not before us. The record clearly establishes the intentions of Joseph's brothers: to break Joseph's will or to deplete the estate to significantly reduce the endowment to Loyola University, and if that failed, to seek redress from Mr. Hardy.
We have concluded there was no legal malpractice committed by Mr. Hardy and we further concluded Mr. Hardy was defamed by decedent's mother's legal malpractice action against Mr. Hardy. I find Mr. Hardy served his client well. Fidelity (loyalty) is an essential element in the lawyer's relationship to a client. LA. RULES OF PROFESSIONAL CONDUCT, Art. 16, Rule 1.7. In my opinion Mr. Hardy upheld that standard in his representation of his client, Joseph Costello, and his client's desire to endow Loyola University at the time of his death notwithstanding exacting adversities.
For these reasons, I respectfully additionally concur in the majority opinion.
NOTES
[1] Costello's broadcast empire included pioneer FM rock radio station WRNO, KXOR FM, WTIX, and worldwide shortwave radio station WRNO.
[2] Mrs. Costello's petition states, in pertinent part:

That defendant Hardy's representation of plaintiff fell below the standard of care of competent practitioners in his same field and in defendant's locality.
....
Defendant Hardy's actions, as described above, constitute negligence, and plaintiff's damages arise from that negligence.
[3] The court of appeal decision relied in part on the ruling of this court in Succession of Killingsworth, 292 So.2d 536 (La.1973) (on original hearing).
[4] Bradford D. Carey, a defendant in the main demand, is not a plaintiff-in-reconvention. Plaintiffs-in-reconvention are Hardy and the law firm, Hardy and Carey, L.L.P.
[5] We note the malpractice suit was filed prior to the settlement of the suit in Civil District Court in Orleans Parish which sought to annul or declare invalid the probated testament of Joseph M. Costello, III.
[6] The summary judgment in favor of Bradford D. Carey was not appealed, and that judgment dismissing Mrs. Costello's claims against Carey is now final.
[7] Mrs. Costello takes issue with the court of appeal's holding regarding all three elements of her claim. She argues particularly that the court erred in opining that she could not pursue her malpractice claim in the absence of an attorney-client relationship, pointing out that Louisiana courts have held attorneys liable to non-clients for malpractice based upon negligence principles of LSA-C.C. art. 2315 and as contract beneficiaries under a stipulation pour autri. See, Succession of Killingsworth, 270 So.2d 196 (La.App. 1 Cir.1972), writ granted, 273 So.2d 292 (La.1973), rev'd in part, aff'd in part, 292 So.2d 536 (La.1973); Woodfork v. Sanders, 248 So.2d 419 (La.App. 4 Cir.1971), writs denied, 259 La. 759, 252 So.2d 455 (1971). Further, Mrs. Costello argues that she established the existence of a material factual dispute with respect to the quality of Mr. Hardy's representation in this matter.

As explained previously, LSA-C.C.P. art. 966 does not require the movant for summary judgment to negate all essential elements of the adverse party's claim, action, or defense, but only to point out to the court that there is an absence of factual support for one or more elements. Thus, our resolution of the damage issue makes it unnecessary to address Mrs. Costello's arguments regarding the first and second elements of her claim.
[8] The terms of the settlement reflect that payment is contingent upon the Succession's satisfying all of its outstanding creditors and administrative expenses and having sufficient assets to satisfy the particular legacies.
[9] To the extent that this statement can be construed as an assertion that damages have accrued in the form of interest on the monies owed and not yet paid by the Succession, this allegation has no merit. The trust document reveals that interest accrues from the date of death and will be paid on the monies owed at the applicable federal rates for charitable remainder trusts.
[10] The classification of defamatory words as either defamatory or defamatory per se is a concept borrowed from the common law. Wattigny v. Lambert, 408 So.2d 1126, 1132-1133 (La.App. 3 Cir.), writ denied, 410 So.2d 760 (La.1981). Since at least 1840, the courts of this state have recognized that defamation is a quasi-offense governed by LSA-C.C. art. 2315, Miller v. Holstein, 16 La. 389 (La. 1840), on reh'g 16 La. 395 (La.1840), rendering questionable the continued necessity of drawing upon the common law distinctions. Nevertheless, this court has recognized the distinction, Madison v. Bolton, 234 La. 997, 102 So.2d 433, 438 (1958); Cangelosi, 390 So.2d at 198, and we choose not to depart from that precedent here.
[11] First Amendment considerations, coupled with the language of LSA-C.C. art. 2315, require some fault as a basis of liability for defamation. Ritchey v. Azar, 383 So.2d 360, 364 (La.1980). Where falsity, malice and injury are presumed, the tort takes on the trappings of a strict liability tort. However, because malice and falsity can be rebutted, liability in the final analysis is predicated upon some degree of fault.
[12] See and compare, e.g., the allegation of misconduct in Freeman v. Cooper, 414 So.2d 355, 357 (La.1982), wherein the plaintiff attorney was accused of lying to the court, acting "above and beyond the law" and of being "outside of the law," in addition to acting surreptitiously in an effort to take advantage of a recently elected judge.
[13] In brief to this court, Mrs. Costello argues that the allegations of her petition are protected by a qualified privilege. Statements made in the course of a judicial proceeding are subject to a qualified privilege if the statements are material to the proceeding, and are made with probable cause and without malice. Freeman v. Cooper, 414 So.2d 355 (La. 1982). However, the existence of a qualified privilege is an affirmative defense. Douglas v. Thomas, 31,470 (La.App. 2 Cir. 2/24/99), 728 So.2d 560, 562, writ denied, 99-0835 (La.5/14/99), 741 So.2d 661; Albarado v. Abadie, 97-478 (La.App. 5 Cir. 11/12/97), 703 So.2d 736, 742, writ denied, 97-3081 (La.2/13/98), 709 So.2d 756 (citing Trahan v. Ritterman, 368 So.2d 181, 184 (La.App. 1 Cir.1979)). Qualified privilege raises a new matter which, assuming the allegations in the petition to be true, constitutes a defense to the defamation action and will have the effect of defeating the defamation claim. Webster v. Rushing, 316 So.2d 111, 114 (La.1975). As such, qualified privilege must be specially pled. Id.; LSA-C.C.P. art. 1005. Because Mrs. Costello failed to plead the defense in the trial court and raised the issue for the first time on appeal, we cannot consider it here. See, Segura v. Frank, 93-1271, p. 15 (La.1/14/94), 630 So.2d 714, 725 (appellate courts generally will not consider issues raised for the first time on appeal).

Had the qualified privilege been properly asserted, however, there is no doubt that it would apply in this case to protect what were in fact minimally offensive allegations essential to state a cause of action. As was noted in Jacobs v. O'Bannon, 472 So.2d 180, 182 (La.App. 4 Cir.1985):
To allow defamation suits to arise out of statements like these would foster an interminable flood of litigation. Whenever one took umbrage to such statements he or she might file suit. Even worse, after the initial defamation is concluded, more defamation suits would follow to obtain satisfaction for offensive statements made in the first defamation suit.
Litigants must be free to allege facts constituting inappropriate conduct if there is any reasonable basis for such allegations and the misconduct is relevant to the proceeding. Freeman, 414 So.2d at 359.
[14] "Malice," in this context, is to be distinguished from "actual malice," or publication with knowledge that a statement is false or with reckless disregard for its truth, which is constitutionally required in certain cases; for example, those in which a public official or figure sues a media defendant. New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
[15] For a more extensive discussion of the malice requirement, see, FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 19-2 at 430-431 and § 19-2(b) at 434-435 (1996).
[16] We come to this conclusion reluctantly and cognizant of the well-settled rule that a reviewing court may only set aside a finding of fact by a trial court if that finding is clearly wrong or manifestly erroneous based upon the evidence presented at trial and the record on appeal. Stobart, 617 So.2d at 882. This court has an affirmative constitutional duty to review facts. La. Const. art. V § 10(B); Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099, 93-3110, 93-3112, p. 8 (La.7/5/94), 639 So.2d 216. It is because of this duty that we are required to determine whether the trial court's decision was clearly wrong based on the evidence in the record or without evidentiary support. Id. A reviewing court must do more than just simply review the record for some evidence that supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's findings are clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882. The reviewing court must always keep in mind that "if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. However, as we have said, this does not mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Ambrose, 639 So.2d at 221.
[17] In fact, in a pre-trial hearing on peremptory exceptions filed by Mrs. Costello, counsel for Mr. Hardy conceded that "we don't have any evidence and the trial will not show any evidence that Mrs. Costello acted with malice," counsel's theory being that she acted in concert with family members, particularly son Michael, who did have an improper motive.

Following the close of evidence, the only evidence of improper motive that the trial court found was Mrs. Costello's deposition testimony that the malpractice action was "plan B" in the event the attack on the validity of the will failed and she was unable to secure her annuity. However, LSA-C.C.P. art. 892 supports Mrs. Costello's right to pursue alternative causes of action so long as the obligations of LSA-C.C.P. art. 863 are met. There is no improper motive that can be inferred from her actions in this regard. Even if the will were upheld, an alternative but not inconsistent allegation is that she was negligently left out of the will.
[18] In reaching this conclusion, it might appear that the qualified privilege (referenced in fn. 4, supra) which was not properly pleaded, has nevertheless been applied. However, as we have recognized, the assertion of a qualified privilege rebuts the plaintiff's allegations of malice and places the burden of proof on the plaintiff to establish malice and lack of good faith. Smith v. Our Lady of the Lake Hospital, 93-2512 pp. 20-21 (La.7/5/94), 639 So.2d 730, 746-747. When, as in this case, malice and falsity are part of the plaintiff's burden in his or her case in chief, the significance of pleading the privilege diminishes. Dan B. Dobbs, The Law of Torts § 413 at 1158 (2001).
[1] "Prosperity asks for fidelity; adversity exacts it." [Lat., Poscunt fidem secunda, at adversa exigunt.] Seneca (Lucius Annaeus Seneca), Agamemnon (934).