GAIDRY, J.
| j>This suit stems from Craig Paretti’s attempt to purchase a life insurance policy from the defendants prior to his death. After summary judgment dismissed all of the plaintiffs’ claims against all defendants, the plaintiffs appealed. We reverse.
FACTS AND PROCEDURAL HISTORY
Craig Paretti owned a Pontiac dealership for over thirty-five years and participated in the GM Dealer Group insurance plan. In 2004, Mr. Paretti’s dealership was terminated by GM, and as a result he became ineligible to participate in the group insurance plan.
Mr. Paretti was informed in a June 18, 2004 letter from Luanne Metropoulos, Group Insurance Representative for the GM Dealer Insurance Group, that he was no longer eligible to continue his $300,000.00 life insurance policy under the group plan. The letter informed him that although his policy was being cancelled, he could convert his group policy to an individual one within thirty-one days. The letter went on to state that he could continue a reduced portion of his coverage under the group plan’s Retirement Continuance Option (“RCO”). The letter included an attached RCO form, but contained no form to apply for a conversion to an individual policy; instead it instructed him to contact MetLife if he was interested in applying to convert his coverage.
Mr. Paretti signed and returned the RCO form on or about July 9, 2004.[1] A July 19, 2004 letter from Luanne Metro-poulos to Mr. Paretti confirmed the GM Dealer Insurance Group’s receipt of Mr. Paretti’s completed RCO Form and Mr. Paretti’s enrollment in that plan for [3$120,000.00 of Life insurance, $60,000.00 of Accidental Death & Dismemberment coverage, and $50,000.00 in Dependent Life coverage under the GM Dealer Group Life Insurance Plan.
In addition to signing and returning the RCO form, Mr. Paretti spoke with his personal insurance agent, Stan Maraldo, about converting his group policy to an individual one. Since Mr. Maraldo was not a MetLife agent, he arranged for Mr. Par-etti to meet with MetLife agent Barry Beilina on July 15, 2004 to discuss conversion of his policy. On July 26, 2004, Mr. Beilina and Mr. Paretti met again and Mr. Paretti signed the application provided by Mr. Beilina to convert his coverage to an individual policy. The premium check for the converted policy was negotiated on July 30, 2004.[2]
Subsequently, on August 27, 2004, Met-Life informed Mr. Beilina that Mr. Paretti was not eligible to convert his policy to an individual one because he had elected to continue reduced coverage under the RCO. On October 7, 2004, Mr. Beilina informed Mr. Paretti that he was not eligible for *325 conversion. Mr. Paretti reportedly became very angry when he was informed that he could not convert his policy to an individual one and told Mr. Beilina that his intent had been to secure the maximum coverage for which he was eligible, and if he was limited to either the reduced coverage under the RCO or the conversion policy, he would choose to convert to an individual policy.
Mr. Paretti suffered a massive heart attack and died on October 8, 2004, the day after he was informed that he was not eligible for conversion. MetLife declined to pay under the conversion policy and eventually returned 14the premium paid for the conversion policy in January of 2005. Mr. Paretti’s widow, Willamena Paretti, and Paretti Motor Company[3] sued Met-Life and Beilina for breach of contract, negligence, detrimental reliance, and arbitrary and capricious failure to pay claims. MetLife deposited $123,600.00 ($120,000.00 Life insurance coverage under the RCO, plus interest) into the registry of the court, which was later withdrawn by the plaintiffs.
The defendants filed motions for summary judgment, which the court granted, dismissing all of the plaintiffs’ claims against the defendants. The court concluded that the only coverage in effect on the date of Mr. Paretti’s death was the reduced amount under the RCO because although Mr. Paretti applied for conversion coverage prior to his death, his application was not accepted. As a result, the conversion policy sued upon was never issued, and the plaintiffs have no contract claims. The court also found that the plaintiffs have no negligence claims because there was no duty owed to the plaintiffs or Mr. Paretti. Finally, the court found that the plaintiffs had no claims for detrimental reliance because they offered no evidence of misrepresentation.
The plaintiffs have appealed, alleging that the trial court erred in not finding that La. R.S. 22:942 required MetLife to provide conversion coverage to Mr. Paret-ti, since Mr. Paretti had met all requirements to convert his coverage to an individual policy, regardless of his choice of the RCO. The plaintiffs also allege that the court erred in failing to find that Mr. Beilina’s actions and representations bound MetLife to convert Mr. Paretti’s policy and that Mr. Beilina breached his duty to Mr. Paretti when he did not timely notify him that his application for coverage had been denied.
J^DISCUSSION
A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Oubre v. Louisiana Citizens Fair Plan, 11-0097, p. 11 (La.12/16/11), 79 So.3d 987. Appellate courts review summary judgments de novo, using the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate. Costello v. Hardy, 03-1146, p. 8 (La.1/21/04), 864 So.2d 129, 137. A motion for summary judgment should only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the movant is entitled to summary judgment as a matter of law. See LSA-C.C.P. art. 966(B).
The burden of proof on a motion for summary judgment remains with the mov- *326 ant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2). Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. Pugh v. St. Tammany Parish School Board, 07-1856, p. 2 (La.App. 1 Cir. 8/21/08), 6994 So.2d 95, 97 (on rehearing), writ denied, 08-2316 (La.11/21/08), 996 So.2d 1113; see also LSA-C.C.P. art. 967(B).[4]
In plaintiffs’ first assignment of error, they argue that Metlife was required under the provisions of La. R.S. 22:942 to allow Mr. Paretti to convert his policy to an individual policy at the amount of life insurance in force under the group policy. Louisiana Revised Statutes 22:942 provides that a policy of group life insurance shall contain the following provisions regarding conversion on termination of eligibility:
(10) Conversion on termination of eligibility: A provision that if the insur-anee, or any portion of it, on an individual covered under the policy ceases because of termination of employment or of membership in the class or classes eligible for coverage under the policy, such individual shall be entitled to have issued to him by the insurer, without evidence of insurability, an individual policy of life insurance without disability or other supplementary benefits, provided application for the individual policy shall be made and the first premium paid to the insurer within thirty-one days after such termination.
It is further provided that:
(a) The individual policy shall, at the option of such individual, be on any one of the forms, except term insurance, then customarily issued by the insurer at the age and for the amount applied for.
(b) The individual policy shall be in an amount not in any event in excess of the amount of life insurance which ceases because of such termination nor less than one thousand dollars unless a smaller amount of coverage was provided for such individual under the group policy, provided that any amount of insurance which matures on the date of such termination or has matured prior under the group policy as an endowment payable to the individual insured, whether in one sum or installments or in the form of an annuity, shall not, for the purposes of this provision, be included in the amount which is considered to cease because of such termination.
*327 |7(c) The premium on the individual policy shall be at the insurer’s then customary rate applicable to the form and amount of the individual policy, to the class of risk to which such individual then belongs, and to his age attained on the effective date of the individual policy.
⅜ ⅜ ⅜ ⅜ ⅜
(12) Death pending conversion: A provision that if a person insured under the group policy dies during the period within which he would have been entitled to have an individual policy issued to him in accordance with Paragraphs (10) and (11) of this Section and before such an individual policy shall have become effective, the amount of life insurance which he would have been entitled to have issued to him under such individual policy shall be payable as a claim under the group policy, whether or not application for the individual policy or the payment of the first premium therefor has been made.
The June 18, 2004 letter from Luanne Metropoulos, Group Insurance Representative for the GM Dealer Insurance Group notifying Mr. Paretti of the cancellation of his group policy contained the following pertinent language:
Because of this change in status, you are no longer eligible for coverage under this plan. Therefore, your insurance has been cancelled effective May 31, 2004.
You may arrange to have all or part of your insurance converted, without medical examination, to an individual policy by making application directly to any office or representative of Metropolitan Life Insurance Company within the 31-day period following the date of the cancellation or the date of this letter, whichever is later.... You or your dependent may convert to any type of Life insurance policy (except term) being issued by Metropolitan.
If you are no longer active in the Dealership due to disability, you may elect to continue Life insurance coverage for yourself for a period of up to six months by making the required contribution.
If you are not eligible to continue your coverage due to disability and do not want to convert, you may continue your group term insurance coverage under the Retirement Continuance Option of the GM Dealer Group Life Insurance Plan, If you retire or sell your dealership, are age 55 or older, and have participated in the Owner Plan for 10 or more consecutive years, you are eligible to continue a portion of your group life insurance coverage, a portion of your Accidental |RPeath & Dismemberment, and all of your dependent life coverage under the Retirement Continuance Option.
Your participation in the Retirement Continuance Option means:
• Continued coverage for you and your Dependents, if already enrolled,
• The same low cost group rates as under the GM Dealer Insurance Plan, and
• No medical examination
The amount of insurance that you will be enrolled for under this option is based on the number of consecutive years you have participated in the Owner Plan. If you would like to take advantage of this opportunity to continue your Group Term Insurance with us, please sign the enclosed Retirement Continuance Form and return it to us within 31 days of the date of this letter.
According to the chart included in the letter and the attached Retirement Continuance Form, Mr. Paretti was eligible under the RCO to continue his group insur- *328 anee at the level of 40% of the original coverage amount ($300,000.00), which resulted in a reduced coverage amount of $120,000.00.
Although the letter does seem to indicate that Mr. Paretti could not both continue his coverage under the RCO and convert his coverage to an individual policy (“If you are not eligible to continue your coverage due to disability and you do not want to convert, you may continue your group term insurance coverage under the [RCO]”), La. R.S. 22:942 is clear that because Mr. Paretti’s insurance (or any portion of it) ceased because of termination of employment or of membership in the class or classes eligible for coverage under the policy, he was “entitled to have issued to him” an individual policy, provided he applied and paid the premium within thirty-one days. Mr. Paretti met the statutory requirements to convert his coverage, and MetLife’s insertion of additional restrictions in a letter cannot take this right away. This entitlement to conversion is further evidenced by subsection (12) of the statute, which provides that where an insured dies during the | sthirty-one day conversion period, even if he has not yet applied to convert his policy to an individual one, the amount of life insurance which he would have been entitled to have issued to him under such individual policy shall be payable as a claim under the group policy. Because Mr. Paretti was entitled to convert his policy to an individual one by simply applying and paying the premium, which he did, the court erred in granting summary judgment on the grounds that no contract was formed.
While we acknowledge MetLife’s argument that the provision of La. R.S. 22:942(10)(b) limiting the amount of the individual policy to the amount of the life insurance that ceases under the group policy would preclude Mr. Paretti from obtaining both the $120,000.00 RCO coverage and the $300,000.00 conversion coverage, we do not agree that this prohibition means that Mr. Paretti could not have converted his group policy to an individual one. Mr. Paretti may have been required to cancel the RCO coverage or to select a lesser amount of conversion coverage. This does not change our opinion that summary judgment was inappropriate.
The plaintiffs also argued that the court erred in dismissing its claims against Mr. Beilina for damages resulting from his unreasonable delay in informing Mr. Par-etti of the denial of his application. Mr. Beilina argued that he cannot be liable to the plaintiffs as a result of any unreasonable delay in notifying Mr. Paretti, because plaintiffs cannot show any loss caused by the delay. In support of this argument, Mr. Beilina cited Thomas v. Life Insurance Company of Georgia, 219 La. 1099, 55 So.2d 705 (La.1951), in which the Louisiana Supreme Court held that even if an agent unreasonably delays informing a prospective insured of the denial of his application for insurance, there can be no claim against the agent based upon this unreasonable delay where there is no evidence the applicant would have 11(⅛applied elsewhere for insurance or that any company would have issued him a policy. Based upon this ruling, Mr. Beili-na argues that there was no evidence that Mr. Paretti would have applied for life insurance elsewhere if he had been informed sooner of the denial of his policy, and furthermore that Mr. Paretti could not have applied to any other company to convert his MetLife group insurance. However, since we have determined that it is clear that Mr. Paretti was entitled to convert his coverage to an individual policy under the provisions of La. R.S. 22:942, we cannot say that Mr. Paretti was not harmed by the unreasonable delay in noti *329 fying him of MetLife’s denial of his application. As such, summary judgment in favor of Mr. Beilina was not appropriate.
CONCLUSION
For the reasons set forth hereinabove, summary judgment in favor of the defendants is reversed. Costs of this appeal are to be shared equally by the defendants.
REVERSED.

. Although there was no date next to his signature on the RCO Form, the handwritten note accompanying the form when it was returned to the GM Dealer Insurance Group was dated July 9, 2004.

. Although the application was ultimately signed more than thirty-one days from the date of the notice of cancellation, Mr. Paretti met with Mr. Beilina and chose to apply for conversion within the thirty-one day period. According to emails between Mr. Beilina and MetLife, the delay in getting the application signed was due to Mr. Beilina’s scheduling conflicts, and coverage was not denied because of the delay.

. Paretti Motor Company sued as an alternate owner and beneficiary of the unissued conversion policy.

. Louisiana Code of Civil Procedure article 967(B) provides: When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.