STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**03-1523**

**TETRA APPLIED TECHNOLOGIES, INC.**

**VERSUS**

**H. O. E., INC.**

********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NUMBER 2002-2481
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

********

**BILLIE COLOMBARO WOODARD**
**JUDGE**

********

Court composed of Billie Colombaro Woodard, Jimmie C. Peters, and Michael G. Sullivan, Judges.

**REVERSED.**

Matthew Douglas McConnell
Christopher Leonard Zaunbrecher
Briney & Foret
Post Office Box 51367
Lafayette, Louisiana 70527-1367
(337) 237-4070
Counsel for Plaintiff/Appellee:
    Tetra Applied Technologies, Inc.

Kay A. Theunissen
Stephen P. Skiles
Mahtook & Lafleur, L.L.C.
Post Office Box 3089
Lafayette, Louisiana 70502
(337) 266-2189
Counsel for Defendant/Appellee:
    Wood Group Logging Services, Inc.

John William Kolwe
Perret, Doise, Professional Law Corporation
Post Office Drawer 3408
Lafayette, Louisiana 70502-3408
(337) 261-1200
Counsel for Defendant/Appellant:
    Hibernia National Bank

Charles C. Culotta, Jr.
Post Office Box 2300
Patterson, Louisiana 70392
(985) 395-3504
Counsel for: Defendant/Appellee:
    Kyle Machine & Tool Co., Inc.

1

Philip A. Gattuso
Post Office Box 1190
Gretna, Louisiana 70054
(504) 368-4141
Counsel for Defendant/Appellee:
    Hose Speciality & Supply Company
    of Lafayette, Inc.

J. Kevin Stockstill
117 Caillouette Place
Lafayette, La 70501
(337) 262-0203
Counsel for Defendant/Appellee:
    Cummins Mid-South, L.L.C.

Jennifer Ziegenhorn
Husch & Eppenberger, L.L.C.
200 Jefferson Avenue, Suite 1450
Memphis, Tennessee 38103
(901) 523-1123
Counsel for Defendant/Appellee:
    Cummins Mid-South, L.L.C.

WOODARD, Judge.

On appeal, Hibernia National Bank (Hibernia) asserts that, when the trial court granted the Trade Creditors' motions for summary judgment, it failed to recognize Hibernia's perfected security interest in the funds deposited in the registry of the trial court. We reverse the trial court's determination.

* * * * *

On June 24, 1999, Hibernia and H.O.E., Inc. (HOE) executed a Factoring Agreement. Under the terms of this agreement, HOE granted Hibernia a security interest in all of its accounts and contracts. In addition, HOE assigned to Hibernia each invoice representing an account receivable to HOE. Specifically, section 11 of the Factoring Agreement provides, in part:

> 8. *Invoicing.* All invoices for merchandise sold or services rendered shall be prepared by [HOE] and shall bear a notification that they have been assigned to, are owned by and are payable directly and only to Hibernia. . . . Each invoice shall bear the terms stated in the approved order or customer credit line and no change from the original terms of sale shall be made without Hibernia's prior written consent. . . .
>
> . . . .
>
> 11. *Security Agreement; Setoff.* As security for all obligations and indebtedness of [HOE] to Hibernia, now existing or hereafter incurred, direct or indirect, absolute or contingent, whether created under this Agreement or otherwise, including without limitation, obligations owed by [HOE] to others which Hibernia obtains by assignment, [HOE] assigns to Hibernia and grants to Hibernia a security interest in (a) all of [HOE's] present and future accounts, accounts receivable and books and records relating thereto, contract rights, instruments, chattel paper, general intangibles, returned or repossessed goods arising out of or relating to the sale or other disposition of goods at any time or from time to time, all proceeds thereof and merchandise represented thereby . . . .

On June 28, 1999, Hibernia filed a UCC-1 Financing Statement to perfect its security interest in HOE's accounts receivable.

On May 29, 2001, Tetra Applied Technologies, Inc. (Tetra), which is "in the business of providing . . . services . . . to the hydrocarbon exploration and production

1

industry," and HOE executed an Equipment Manufacturing Contract (Manufacturing Contract), in which HOE agreed to construct four wireline skid units and two spare cable drums for Tetra. As HOE constructed these items, it issued invoices for payment to Tetra. HOE previously assigned these invoices, representing the amounts Tetra owed, to Hibernia.

To complete this project, HOE purchased various supplies and equipment from Kyle Machine & Tool, Inc, Cummins Mid-South, L.L.C., Hose Specialty & Supply Company of Lafayette, Inc., and Wood Group Logging Service, Inc. (collectively referred to hereinafter as the "Trade Creditors"). Tetra and HOE specifically outlined in the Manufacturing Contract that if any subcontractors filed liens or claims against Tetra or its property, it could withhold from HOE payments in an amount sufficient to offset any such liens or claims.

On May 13, 2002, due to HOE's breach of the Manufacturing Contract, Tetra filed a petition for writ of sequestration seeking possession of the incomplete skid units and spare cable drums that HOE was building at the time. Thereafter, Tetra obtained an order allowing it to seize these items.

On August 21, 2002, Tetra amended its writ of sequestration converting it to a concursus proceeding when it discovered that many of HOE's subcontractors (including the Trade Creditors), who provided HOE with the equipment and supplies it needed to complete this project, did not get paid.

Because HOE owed it $189,996.57, Hibernia filed a motion for summary judgment claiming that it held a prior perfected security interest in and was entitled to the funds Tetra deposited in the registry of the trial court. Similarly, the Trade Creditors filed motions for summary judgment seeking, collectively, $38,042.06 for the equipment and services they provided in connection with this project. The trial court found the Trade Creditors' claims superior and, as such, granted their motions for summary judgment and denied Hibernia's.

On appeal, Hibernia asserts that the trial court erred when it granted the Trade Creditors' motions for summary judgment: (1) by failing to give effect to Hibernia's perfected security interest in the funds in the registry of the trial court; (2) by finding that the Trade Creditors each held a vendor's privilege over these funds; (3) by finding that the Trade Creditors had a consensual lien or privilege under the terms of the

2

Manufacturing Contract, and (4) by finding that the Trade Creditors were third party beneficiaries of this contract.

* * * * *

SUMMARY JUDGMENT

We will grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law."[1] We must review summary judgments *de novo* under the same criteria that govern the trial court's consideration of whether summary judgment is appropriate.[2] When confronted with legal issues raised in a motion for summary judgment, we give no special weight to the findings of the trial court and render a judgment on the record.[3]

HIBERNIA'S PRIOR PERFECTED SECURITY INTEREST

Hibernia, as the only party with a valid security interest encumbering the funds in the registry of the trial court, claims that it has the rights to these funds. On the other hand, the trial court concluded that a provision in the Manufacturing Contract, between Tetra and HOE, allowed Tetra to withhold these funds owed to HOE. Thus, according to the trial court, when Tetra exercised its right to withhold payment and later deposited these funds in the registry of the court, Tetra took the place of HOE for any amounts owed to the Trade Creditors, which, in turn, gave the Trade Creditors a right that was superior to Hibernia's since these deposited funds never actually belonged to HOE. Specifically, the trial court held:

> I think what the contract does, in effect, . . . is that Tetra takes the place of HOE as to monies owed to the Trade Creditors, if HOE defaults in its payment to them, so that contractually Tetra would stand in the shoes of HOE [and] would become a depository or keeper of the funds that would

[1]La.Code Civ.P. art. 966(B).

[2]*See Costello v. Hardy*, 03-1146 (La. 1/21/04), 864 So.2d 129.

[3]*See Campbell v. Markel Am. Ins. Co.*, 00-1448 (La.App. 1 Cir. 9/21/01), 822 So.2d 617, *writ denied*, 01-2813 (La. 1/4/02), 805 So.2d 204.

have been due to them had the funds been paid over to HOE. But that effectively, contractually, these monies do not belong to HOE, nor does HOE have any claim to them. And I think the only people to whom these monies are due at this point would be the Trade Creditors, and that's my decision.

Louisiana enacted Article 9 of the Uniform Commercial Code (UCC) as Chapter 9 of the Louisiana Commercial Laws, effective January 1, 1990. This Chapter regulates the creation of conventional real security in most movables and supplants the law of pledge and chattel mortgage with a single device called a security interest.[4] By separating the consequences of possession from the privilege or priority given by the security, Chapter 9 permits possession to be gained or lost according to agreement of the parties without otherwise affecting the rights of the secured party.[5]

Louisiana Revised Statutes 10:9-109 provides in pertinent part:

> **(a) General scope of Chapter**. Except as otherwise provided in subsections (c) and (d), this Chapter applies to:
>
> . . . .
>
> (3) *a sale of accounts*, chattel paper, payment intangibles, or promissory notes;
>
> . . . .
>
> **(d) Inapplicability of Chapter**. This Chapter does not apply to:
>
> . . . .
>
> (2) a lien, other than an agricultural lien, given by statute for services or materials, but R.S. 10:9-322(h) and 9-333 apply with respect to priority of the lien;
>
> . . . .
>
> **(e) Certain sales**. *The application of this Chapter to* the *sale of accounts*, chattel paper, payment intangibles, or promissory notes is not intended and shall not be used to recharacterize that sale as a transaction to secure indebtedness, but *is intended to protect purchasers of those*

---

[4]Thomas A. Harrell, *A Guide to the Provisions of Chapter Nine of Louisiana's Commercial Code*, 50 LA. L. REV. 711 (1990).

[5]*Id.*

*assets by providing a notice filing system. For all purposes*, in the absence of fraud or intentional misrepresentation, *the parties' characterization of a transaction as a sale of accounts*, chattel paper, payment intangibles, or promissory notes *shall be conclusive that* the transaction is a true sale and is not a secured transaction and that *title has passed to the party characterized as the purchaser, regardless of whether the purchaser (secured party) has any recourse against the seller (debtor), whether the seller is entitled to any surplus, whether the purchaser has possession of the note, contract, account agreement, invoice, or other evidence of indebtedness, or any other term of the parties' agreement.*

(Emphasis added.) Louisiana Revised Statutes 10:1-201(37) defines a "security interest" as:

> [*A*]*n interest in personal property or fixtures, created by contract, which secures payment or performance of an obligation. . . . The term also includes any interest of . . . a buyer of accounts*, chattel paper, payment intangible, or a promissory note in a transaction that is subject to Chapter 9. A lien or privilege created by operation of law is not a "security interest."

(Emphasis added.) In addition, the attachment of a security interest in collateral gives the secured party the rights to "proceeds" of the collateral, which includes the rights to a supporting obligation for the collateral.[6] In "A Guide to the Provisions of Chapter Nine of Louisiana's Commercial Code," Thomas A. Harrell explains:

> The concept of proceeds includes not only fruits, revenues, and products derived from the collateral, but also amounts received from insurance covering it as well as what is received from its sale, exchange, expropriation, or other voluntary or involuntary disposition whether or not the security interest continues in the collateral in the hands of the transferee. Furthermore, things that are acquired with proceeds or are received from or with respect to them are also proceeds of the collateral. The security interest thus acts in the manner of a general mortgage or privilege, attaching to proceeds without further action, although in some cases additional perfection as to the proceeds may be required. The security in proceeds is also generally deemed to be a continuation of the security in the collateral as though the proceeds were merely a divided part of the collateral.[7]

---

[6]La.R.S. 10:9-203(f).

[7]Harrell, *supra* note 3, at 758 (footnotes omitted).

Furthermore, La.R.S. 10:9-201 declares that a security agreement (whether or not it is perfected) is generally effective when it attaches according to its terms not only between the parties, but also as to purchasers of the collateral and other creditors of the debtor, including those having privileges.[8] However, there are many exceptions, particularly in the case of <u>unperfected security</u>, where our legislature chose to protect persons who deal with the collateral without knowledge or fair notice of the security interest.[9]

Under the Factoring Agreement, HOE granted a security interest in, and assigned, its accounts receivable to Hibernia. On June 28, 1999, Hibernia perfected its security interest in HOE's accounts receivable by filing a UCC-1 Financing Statement.

To make a security interest fully effective against third persons a secured party must perfect their security interest.[10] Thomas A. Harrell describes, in detail, the benefits of obtaining perfected status:

> Perfection by filing is ordinarily accomplished by filing a financing statement. . . . The financing statement is neither intended nor designed to permit one to determine from the public records whether or to what extent particular collateral may actually be encumbered. The filing merely serves as a warning to the public that a security interest may exist. The statement is required only to identify the debtor, a secured party, and the collateral that may be subject to its terms. . . . Provision is then made for interested persons to obtain from the secured party, through the debtor, verification of the nature and extent of the security and the obligations it secures in the manner previously discussed.
>
> . . . .
>
> . . . A financing statement thus serves as something in the nature of a warrant for the named secured party to thereafter extend credit to the debtor at will with the assurance that he will have priority over others to whom the debtor incurs similar obligations, although such priority is not absolute.
>
> Filing a financing statement gives priority to any security interest granted by the debtor to the secured party in the property (or type of

---

[8]*Id.*

[9]*Id.*

[10]*Id.*

property) it describes as long as it is effective. This permits persons contemplating financing to file their statements before "closing" and having reasonable assurance that their claims will not be outranked by the claims of others who may have acquired some right or interest in the collateral shortly before closing.[11]

In this instance, Hibernia (the secured party), by perfecting its security interest in HOE's (the debtor's) accounts receivable (the collateral described in the financing statement), warned the public that it had a security interest in this collateral; thus, Hibernia was confident that its claim to HOE's accounts receivable would outrank the claims of others who later acquired some right or interest in this collateral.

Because Hibernia took these measures, the public records clearly evidenced its claim to all of HOE's accounts receivable when Tetra and the Trade Creditors did business with HOE approximately two years later. To provide an additional warning of Hibernia's ownership interest in this collateral, HOE stamped on each invoice it sent to its customers:

> The account receivable evidenced by this invoice has been assigned to, sold to, is owned by and payable only to Hibernia National Bank. Please remit payments to:
>
> Hibernia National Bank
> P.O. Box 54349
> New Orleans, LA 70154-4349

Therefore, the recorded UCC Financing Statement and the stamped invoices clearly put Tetra, the Trade Creditors, and all other parties on notice of Hibernia's secured interest in and ownership of HOE's accounts receivable.

Generally, Chapter 9 only protects "innocent transferees for value"—those who take the collateral without knowledge of a prior unperfected security interest, before they give value for their interest.[12] Nevertheless, the Trade Creditors claim that the following provision in the Manufacturing Contract, executed by Tetra and HOE, made their claims superior to Hibernia's:

---

[11]*Id.* at 738-39 (footnotes omitted).

[12]*Id.* at 747.

7

> **Liens and Claims:** [HOE] shall pay all Project amounts to its suppliers, materialmen and mechanics when due, and further shall keep all [Tetra's] property including the Project, free and clear of all liens, claims, and encumbrances arising out of this Agreement. In the event a lien or claim arising out of [HOE's] performance of this Agreement is filed against [Tetra] or its property, [Tetra] shall have the right to withhold from payments due [HOE] an amount sufficient to offset such lien or claim. Such amounts shall be held until proof of payment of the lien is received, a lien release is received, [HOE] provides a sufficient bond to offset the lien amount, or [Tetra] is directed to pay the lien by [HOE] or a court of competent jurisdiction. Such amounts shall be held without interest.

According to the Trade Creditors, the fact that Tetra decided to withhold its payments to HOE made their claims enforceable, since HOE never had a right to the funds withheld; consequently, these funds cannot be considered accounts receivable of HOE. In other words, the Trade Creditors are asserting that, under the terms of the Manufacturing Contract, the funds deposited in the registry of the trial court are not HOE's accounts receivable; thus, Hibernia's security interest did not attach to these funds. We disagree.

Under Chapter 9, an "account" is defined, in part, as any "right (written or oral) to payment of a monetary obligation not evidenced by an instrument or chattel paper, whether or not earned by performance," for: (1) property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of; or (2) services rendered or to be rendered.[13] Louisiana Revised Statutes 10:9-318 further provides:

> (a) **Seller retains no interest**. *A debtor that has sold an account,* chattel paper, payment intangible, or promissory note *does not retain an ownership interest in the collateral sold*.

(Emphasis added.) The UCC Comments to Section 10:9-318 state in part:

> 4. **Effect of Perfection**. *If the security interest of a buyer of accounts . . . is perfected* the usual result would take effect: *transferees from and creditors of the seller could not acquire an interest in the sold accounts . . . .*

---

[13]La.R.S. 10:9-102(a)(2).

(Emphasis added.) Accordingly, to protect against the seller's creditors, the buyer of accounts must perfect their security interest in the accounts, as Hibernia did.

On June 24, 1999, when HOE (the debtor or seller) assigned its accounts to Hibernia (the buyer), HOE lost an ownership interest in this collateral on June 28, 1999—the day Hibernia perfected its interest.[14]  Therefore, no provision in the Manufacturing Contract could grant the Trade Creditors (creditors of the debtor or seller) an interest in the accounts HOE sold to Hibernia due to the fact that HOE had no ownership interest in its accounts receivable when Tetra and HOE executed this contract on May 13, 2002.

"There are no exceptions by which a transferee of accounts in which a security interest has been perfected may take free of the interest."[15]  (Emphasis added.) Consequently, the trial court should have granted Hibernia's motion for summary judgment because it was the only party with a perfected security interest in the funds that Tetra withheld.  This conclusion pretermits our need to address Hibernia's other assignments of error.

The policy, which has prevailed in Louisiana, is to deny the benefits of security to a creditor who does not take the steps the law declares are necessary to give publicity to his interest.[16]  Furthermore, our holding in the instant case does not leave creditors, like the Trade Creditors, without a means to protect their interests.[17]  Their claims could have possibly had "superpriority status" if they had obtained a "purchase money security interest" (PMSI) in the goods they provided to HOE.[18]  Generally, a perfected PMSI in goods and its identifiable proceeds has priority over a conflicting security interest in the same goods, if the PMSI is perfected when the debtor receives possession of the collateral or within twenty days thereafter.[19]

Thus, we hold that Hibernia, as the only claimant with a perfected security interest in HOE's accounts, has a priority interest in the funds deposited in the registry

---

[14]*See* La.R.S. 10:9-318.

[15]Harrell, *supra* note 3, at 754.

[16]*Id.*

[17]*See First Nat'l Bank v. Beckwith Mach. Co.*, 94-2065 (La. 2/20/95), 650 So.2d 1148.

[18]*See Id.*

[19]La.R.S. 10:9-324.

of the trial court. We reverse the trial court's decision to grant the Trade Creditors' motions for summary judgment, and grant Hibernia's motion for summary judgment.

## CONCLUSION

We reverse the granting of a summary judgment to the Trade Creditors, and grant Hibernia a summary judgment on its claim to the funds deposited in the registry of the trial court. We assess all costs of this appeal to the Trade Creditors/Appellees.

**REVERSED.**