ROSEMARY LEDET, Judge.
|, This is a defamation case. From a judgment in favor of the plaintiff,' Reverend Norwood Thompson, Jr., the defendants, First Zion Baptist Church of New Orleans (the “Church”), Anthony Bridges, Dianne Rose, Frank Ben, Hilda Butler, Joyeelyn Patterson, Lillian Decquir, Thea-da Bridges, and Harold Rose (collectively the “Church Defendants”) appeal. For the reasons that follow, we affirm.
PROCEDURAL AND FACTUAL BACKGROUND
This defamation claim arose from the following pertinent facts. The Church had two boards: the Deacon Board, which was responsible for its spiritual matters; and the Trustee Board, which was responsible for its financial matters. At the pertinent time, all of the individual Church Defendants, with the exceptions of Lillian Dec-quir and Theada Bridges, were members of at least one of these boards: Anthony Bridges was the Trustee Board’s president; Frank Ben was the Trustee Board’s treasurer; Dianne Rose was the Trustee Board’s secretary; Joyeelyn Patterson and Hilda Butler were Trustee Board members; and Harold Rose was the | ?Deacon Board’s chairman. Lillian Decquir was the Church’s clerk. Lastly, Theada Bridges was Anthony Bridges’ wife and Rev. Thompson’s sister.
In late August or early September 1999, Frank Ben, Harold Rose, Lillian Decquir, and two other Church members went to the Church’s Bank, Bank One of Louisiana. These members desired to obtain information on the Church’s finances, because the Church was planning on building a new sanctuary. They were advised by Bank One that the Church had a $50,000 certificate of deposit (“CD”). Frank Ben, Harold Rose, and Lillian Decquir went back to the Church and informed Anthony Bridges about the $50,000 CD. At this time, there were approximately five or six signatories on the Church’s checking account at Bank One, including Anthony Bridges, Lillian Decquir, Harold Rose, and Rev. Thompson. Anthony Bridges and the other Trustee Board members then returned to Bank One and had Rev. and Mrs. Thompson removed as signatories on the account. They had the signatories changed to include only Anthony Bridges, Lillian Decquir, and Frank Ben.
In mid-September 1999, Anthony Bridges held a meeting with the Trustee and Deacon Boards. Rev. and Mrs. Thompson were not invited to the meeting, even though Mrs. Thompson was a Trustee Board member. However, the Thomp-sons learned of the meeting from Lillian Decquir and decided to attend as they both held positions regarding the Church’s finances. During the meeting, Rev. Thompson was unable to identify the source of the CD and was asked to step down as pastor.
|sRev. Thompson continuously informed the Church Defendants that he did not steal any money from the Church and that the CD did not belong to the Church. Thereafter, Rev. Thompson realized, and told the Church Defendants, that the tax identification number on the CD was not the Church’s tax identification number.
On October 22, 1999, Rev. Thompson and Mrs. Thompson filed a petition for damages and injunctive relief against the *657 Church Defendants and the Church’s bank, Bank One.[1] In their petition, the Thompsons made the following pertinent allegations:
• In 1996, the Board of Trustees [of First Zion Baptist Church of New Orleans], made Plaintiff, Pastor, REV. NORWOOD THOMPSON, JR. responsible for maintenance of the church’s financial books, including checking accounts.
• On or about September 15, 1999, Defendant, Anthony Bridges, acting as Chairman of the Trustee Board, called a special meeting of the First Zion Baptist Church of New Orleans, Trustee Board.
• At the September 15, 1999 meeting Plaintiffs were falsely accused by the Defendants, Anthony Bridges, Joyce-lyn Patterson, Lillian Decquir, Tommie Varnado, Leon Hillary, Frank Ben, Terry Beaver[,] Avis McSwain, Jacquelyn Jones, Hilda Butler of having improperly used funds belonging to First Zion Baptist Church of New Orleans, for their own purposes.
• On September 27, 1999, Plaintiff, Rev. Norwood Thompson, Jr., [was] accused by Defendants of embezzlement of church funds. Specifically Rev. Thompson was accused of having purchased a 1992 Certificate of Deposit with Bank One of Louisiana valued in an amount equal to $51,000 with church funds.
• In the September 27th meeting the Plaintiff, as Pastor, was treated with such contempt as being called a thief and liar by the Defendants before members of their church.
LBased on the above allegations, Rev. Thompson sought damages for defamation and injunctive relief. He alleged that he was removed as pastor of the Church pursuant to an illegal election by an improperly constituted Board of Directors.
Despite injunctions and restraining orders issued by the trial court, Rev. Thompson was denied access and locked out of the Church on several occasions. At an injunction hearing on October 29,1999, the trial court judge informed the Church Defendants that Bank One had in fact made a mistake with regard to the ownership of the CD. Despite this information, the court had to order that Rev. Thompson be restored to his pastoral duties on several occasions. Further, the Church Defendants presented Rev. Thompson with a resignation letter in December 1999, which he refused to sign.
On September 6, 2000, the Church Defendants filed a Petition for Damages for Defamation and Breach of Fiduciary Duty against Rev. Thompson and Mrs. Thompson (the “2000 Lawsuit”). In their petition, the Church Defendants averred:
• That plaintiffs [the Church Defendants], in their capacities as members of the Board of Deacons and/or Board of Trustees, began planning for the construction of a new Church building, which required an assessment of the current financial position of First Zion.
• That during this assessment of the financial position of First Zion, some questions arose regarding the finances and the defendants’ role therein.
• That defendants refused to cooperate with an investigation into these questions, and attempted to thwart the in *658 vestigation through threats and intimidation.
• Nonetheless, the Boards’ investigation revealed that Reverend Thompson had misappropriated Church funds and used them for his own personal benefit, to the detriment of First Zion.
• That the defendants’ actions constitute a breach of fiduciary duty to First Zion and its members.
|r* That the defendants’ actions also constitute fraud, as he misrepresented and/or suppressed the truth made with the intention to cause loss and/or inconvenience to the Church. and its members.
• Then, in April of 2000, defendant Rev. Thompson left First Zion to open another church.
• When he did so, an audit of church property was performed which found that several items were missing, including two computers, a communion set, a paper shredder, software books, a microphone system, and other computer hardware.
• That upon information and belief, defendants took these items from First Zion.
During this same time period, a television news special called “Showeth Me the Money” was aired on Fox 8. In the news special, one of the Church’s Deacons, John Tedford, accused Rev. Thompson of stealing the Church’s money. This news special aired several times over a two year period.
The early procedural history of Rev. Thompson’s defamation lawsuit against the Church Defendants is outlined in Thompson v. Bank One of Louisiana, 05-1101, pp. 1-3 (La.App. 4 Cir. 1/11/06), 925 So.2d 555, 556-57, as follows:
• 11/05/99 The district court issues a preliminary injunction, amended on 11/12/99, which orders that: (1) Rev. Thompson be reinstated as pastor pending the election of a new Board to be held December 17, 1999; (2) Prior to the date set for the new election, the parties are to agree upon a roster of current church members eligible to participate in the election of the new Board; and (3) During the interim 45 days, any checks drawn on First Zion’s Bank One account must contain the signatures of two named persons in addition to that of Rev. Thompson to be valid.
• 1/28/00 The district court issues a “permanent” injunction “to’ protect [Rev. Thompson’s] right to access and use of First Zion Baptist Church of New Orleans as the presiding pastor, pending a full hearing on the merits before this [the district]Court.”
• 2/03/00 First Zion obtains an order appealing the permanent injunction to this [the Fourth Circuit] Court.
|r* 10/03/01 This [the Fourth Circuit] Court renders an unpublished opinion, which vacates the district Court’s injunction as being vague and pretermits discussion of all other assignments of error, including the alleged absence of subject matter jurisdiction and the allegation that the permanent injunction was invalid because it was issued without the required hearing. Rev. Nor-wood Thompson v. Bank One, et al, 2000-1085 (La.App. 4 Cir. 10/3/01), 798 So.2d 338 (unpublished).
• 3/07/02 Rev. Thompson’s ex parte motion to enter judgment in accordance with the Nov. 1999 preliminary injunction, which motion had been granted by the district court, is vacated on writ application to this Court because of the ex parte nature of the motion.
• 4/02/02 First Zion files an exception of lack of subject matter jurisdiction.
*659 • 5/14/02 Rev. Thompson files a second ex parte motion to enforce the Nov. 1999 preliminary injunction.
• 8/15/02 The district court denies First Zion’s exception of lack of subject matter jurisdiction.
• 8/05/03 Rev. Thompson files a motion to set a hearing on the preliminary injunction granted in Nov. 1999, which motion the district court denies as moot.
• 12/09/03 This Court [the Fourth Circuit] grants Rev. Thompson’s writ application, reverses the district court’s denial of the motion and orders that court to conduct a hearing to determine what actions First Zion and Bank One are to refrain from and whether any actions already taken by them were in violation of prior trial court rulings.
• 2/22/05 The original district court judge recuses himself before the hearing (scheduled for 2/23/05) takes place; Rev. Thompson moves to reset the hearing.
• 3/16/05 The newly assigned district court judge orders a hearing.
• 5/21/05 A hearing on the merits of the Nov. 1999 preliminary injunction is held in the district court.
• 7/11/05 The district court [after first noting that “the passage of time has created inequities for all concerned”] renders a written judgment with reasons, ordering that: (1) Rev. Thompson be reinstated to his position as pastor of First Zion; (2) Rev. Thompson be given keys to the church and the church office; (3) Rev. Thompson’s personal items be returned to him; (4) Rev. Thompson’s salary be reinstated; and (5) Rev. Thompson has a right to “an election” pursuant to a church membership list approved by the court.
17* 7/13/05 First Zion files the instant writ application seeking reversal of the district court’s 7/11/05 judgment.
In January 2006, this court held that the court-ordered permanent reinstatement of Rev. Thompson as pastor of First Zion violated the constitutional principle of separation of church and state. Given this constitutional prohibition, we held that “specific performance, i.e., the reinstatement of Rev. Thompson as pastor of First Zion, is a remedy unavailable to plaintiffs under the facts of this case.” Thompson, 05-1101 at p. 3, 925 So.2d at 556-57. We further held that “should the plaintiffs ultimately prove at trial of this matter that Rev. Thompson was wrongfully removed from his position and/or was defamed through the fault of First Zion, the only redress to which the plaintiffs will be entitled is an award of damages, assuming such are proven.” Id.
In March 2007, the trial court granted Bank One’s motion for partial summary judgment dismissing the defamation claim against it. In 2010, Bank One filed another motion for summary judgment seeking dismissal of the remaining claims. Although the trial court in April 2010 granted that motion,[2] this court reversed and found that “a genuine issue of material fact exists as to whether a sufficient nexus exists between Reverend Thompson and Bank One such that the defendant owed a duty of care to him.” Thompson v. Bank One of Louisiana, NA, 10-1489, p. 4 (La.App. 4 Cir. 3/23/11), 69 So.3d 490, 492.
On May 14 and 15, 2012, a bench trial was held. At trial, the plaintiffs called the *660 following four witnesses: (i) Rev. Thompson; (ii) Mrs. Thompson; (iii) Shael |SN. Wolfson, Ph.D; and (iv) Dr. Robert Quin-tal.[3] Although the defendants called no live witnesses, the deposition testimony of one of the Church Defendants, Anthony Bridges, was introduced. On November 19, 2012, the trial court rendered a judgment against both Bank One and the Church Defendants. The trial court found Bank One liable for breach of their fiduciary duty, and it found the Church Defendants liable for defamation. The trial court awarded the plaintiffs $312,640 in back pay, $120,246 in loss of pastor annual payments, and $79,795 in loss of fringe benefits, plus court costs and legal interest. On November 26, 2012, the trial court amended the judgment to provide that the damage awards were made solely in favor of Rev. Thompson and to deny any recovery to Mrs. Thompson.
On February 6, 2013, the trial court rendered judgment granting the Motion to Unseal the Record filed by the Thomp-sons. The trial court also rendered a judgment on the Motions for New Trial and Amended Judgment filed by all the parties. The trial court rendered judgment in favor of Rev. Thompson and against all the defendants awarding the following special damages: $196,228.00 for back pay, $120,246.00 for pastoral annual payment loss, $79,795.00 for fringe benefit loss, plus cost and interest from the date of judicial demand.[4] The trial court allocated fault as follows: 30% to Bank One, and 70% to the Church Defendants. The trial court additionally awarded Rev. Thompson general damages of $150,000, plus cost and interest from the date of judicial demand, against only the Church ^Defendants. The trial court also dismissed all of Mrs. Thompsons claims against the defendants. This appeal by the Church Defendants followed.
STANDARD OF REVIEW
The applicable standards of review in this case are as follows. To the extent the issues presented involve the trial court’s factual findings, the manifest error standard of review applies. The Louisiana Supreme Court recently summarized the manifest error standard as follows:
It is well-settled in our jurisprudence that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. Ardoin v. Firestone Polymers, L.L.C., 10-0245 at p. 6 (La.1/19/11), 56 So.3d 215, 219. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. at 882-883. However, where documents or objective evidence so contradict the witness’ story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit *661 the witness’ story, the court of appeal may find manifest error or clear wrongness, even in a finding purportedly based upon a credibility determination. Id. at 882; Rosell v. ESCO, 549 So.2d 840 (La.1989).
Zito v. Advanced Emergency Medical Services, Inc., 11-2882, p. 4-5 (La.5/8/12), 89 So.3d 372, 375.
To the extent the issues presented involve the trial court’s damage awards, the following standard applies:
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it “shocks the conscience.” Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991).
Sommer v. State, Dep’t of Transp. & Dev., 97-1929, p. 17 (La.App. 4 Cir. 3/29/00), 758 So.2d 923, 934-35.
|inDISCUSSION
On appeal, the Church Defendants assert the following assignments of error:
• Whether the trial court erred in finding that the plaintiff provided sufficient evidence to support a claim of defamation per se, and applying presumptions of falsity, malice, and injury.
• Whether the trial court erred in finding that the plaintiff met his burden of proof on the elements required to establish a defamation claim.
• Whether the trial court erred in finding that the lawsuit filed by the church constituted defamation.
• Whether the trial court erred in finding that the Fox-8 broadcast constituted defamation.
• Whether the trial court abused its discretion in admitting the Fox-8 broadcast when it was irrelevant and overly prejudicial.
• Whether the trial court’s decision on the merits is based on a mistake of fact.
In essence, the Church Defendants appeal the trial court’s finding of both liability and damages as to Rev. Thompson’s defamation claim. In this appeal, we address liability and damages separately.
I. LIABILITY FOR DEFAMATION
The Louisiana Supreme Court has described the tort of defamation as the invasion of a person’s interest in his or her reputation and good name. Kennedy v. Sheriff of East Baton Rouge, 05-1418, p. 4 (La.7/10/06), 935 So.2d 669, 674 (citing Costello v. Hardy, 03-1146, p. 12 (La.1/21/04), 864 So.2d 129, 139). Four elements are necessary to establish a claim for defamation: (1) a false and defamatory statement concerning another, (2) an unprivileged publication to a third party, (3) fault (negligence or greater) on the part of the publisher, and (4) resulting injury. Id. The fault requirement is generally considered to be malice, actual or implied. Id. By definition, a statement is defamatory if it tends to harm a person’s ^reputation, lowers the person in the estimation of the community, deters others from associating with the person, or otherwise exposes the person to contempt or ridicule. Id.

(a) Defamation per se

In Louisiana, defamatory words have traditionally been divided into two categories. First, words that are defamatory per se are those which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one’s personal or professional reputation, without considering extrinsic facts *662 or circumstances. When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Injury may also be presumed. The second type of defamatory words are words that are susceptible of a defamatory meaning. In that case, a plaintiff must prove, in addition to a defamatory meaning and publication, falsity, malice (or fault) and injury. Kennedy, 05-1418 at p. 5, 985 So.2d at 674-75.
We find that the trial court was correct in finding the Church Defendants’ statements were defamatory per se. The Church Defendants accused Rev. Thompson of “embezzlement of Church funds,” and of being a “thief’ and a “liar” in front of other members of the Church. Further, the Church Defendants filed a lawsuit against Rev. Thompson, after they had been informed by the trial court judge that Rev. Thompson did not take the $50,000 CD in the Church’s name. The lawsuit alleged that Rev. Thompson “misappropriated Church funds and used them for his own personal benefit.” Further, the lawsuit stated that “the defendant’s [Rev. Thompson] actions constituted fraud as he misrepresented and/or suppressed the truth made with the intention to cause loss/ and or inconvenience to the Church and its members.” Lastly, the lawsuit stated that “several items were missing, 112including two computers, a communion set, a paper shredder, software books, a microphone system, and other computer hardware” and that “defendants took these items from First Zion [the Church].” These accusations are defamatory per se because they accused Rev. Thompson of criminal conduct and because, by their very nature, they tended to injure Rev. Thompson’s professional reputation as a pastor. Thus, Rev. Thompson did not need to prove defamatory words, malice, or falsity. Melancon v. Hyatt Corp., 589 So.2d 1186, 1189 (La.App. 4th Cir.1991) (holding that “because plaintiff Melancon was accused of stealing, he did not need to prove defamatory words, malice or falsity”).
The Church Defendants, however, contend that the allegations in their lawsuit do not constitute defamation per se. In support, they cite Kirksey v. New Orleans Jazz and Heritage Found., Inc., 12-1351, p. 8 (La.App. 4 Cir. 2/27/13), 116 So.3d 664, 670. We find this case distinguishable from Kirksey.
In Kirksey, the plaintiff, Kirksey, filed suit against the New Orleans Jazz and Heritage Foundation (the “Foundation”) for defamation. 12-1351 at p. 2, 116 So.3d at 667. The suit for defamation was based on an original suit filed by the Foundation against Kirksey for funds that the Foundation claimed were owed to it by Kirksey. 12-1351 at p. 10, 116 So.3d at 671. The Foundation’s petition contained allegations of “misappropriating, concealing, converting and/or conspiring to misappropriate certain rebates due to the plaintiff from ticket sales.” 12-1351 at p. 5, 116 So.3d at 668. The court held that Kirksey’s closely held corporation did owe these funds to the plaintiff and that it breached its contract, but that Kirksey was not personally liable. 12-1351 at p. 1, 116 So.3d at 666. Kirksey filed suit against the Foundation, claiming defamation based on the allegations in the plaintiffs original petition. 12-1351 at p. 2, 116 So.3d at 667. This court stated 11sthat “[t]he words contained in the Foundation’s petition, which Kirksey complains are defamatory, are words such as misappropriation, conversion, and civil conspiracy, all of which are words used commonly in the area of civil tort litigation.” 12-1351 at p. 8, 116 So.3d at 670. Thus, this court did not find that “these words, *663 used in this context, are defamatory per se.” Id.
In this case, unlike Kirksey, the Church Defendants’ lawsuit contained allegations of criminal conduct against Rev. Thompson, not merely personal liability for one’s business pursuant to a business contract. Also unlike Kirksey, the Church Defendants’ lawsuit not only accused Rev. Thompson of misappropriating money, but also of committing fraud and stealing Church property. These allegations thus go beyond common civil tort litigation allegations; these allegations are criminal allegations that, by their very nature, harm Rev. Thompson’s reputation as a pastor. This case is also distinguishable from Kirksey in that here, there was never any truth found to the Church Defendants’ allegations. In fact, the Church Defendants abandoned their lawsuit.
Most importantly, the Church Defendants filed their lawsuit against Rev. Thompson after they were told by the trial court judge that Rev. Thompson had not misappropriated Church funds (the $50,000 CD) and that Bank One had made an error. Under these circumstances, the Church Defendants’ accusations in their lawsuit against Rev. Thompson constitute defamation per se.

(b) Publication of defamatory statements

The primary issue in this case is whether Rev. Thompson proved the second element of defamation — publication. Proof that a defendant made an unprivileged publication to a third party is a crucial element of a defamation claim. Brunet v. Fullmer, 00-0644, p. 4 (La.App. 4 Cir. 1/10/01), 777 So.2d 1240, 1242. ^^Publication means the communication of non-privileged defamatory words to even one single person besides the party defamed. Martin v. Lincoln General Hosp., 588 So.2d 1329, 1333 (La.App. 2d Cir.1991) (citing Toomer v. Breaux, 146 So.2d 723, 726 (La.App. 3d Cir.1962)). A defendant who utters a defamatory statement is responsible for all republication that is the natural and probable consequence of the author’s act. Martin, 588 So.2d at 1333 (citing Wattigny v. Lambert, 408 So.2d 1126 (La.App. 3d Cir.1981) and Giordano v. Tullier, 139 So.2d 15 (La.App. 4th Cir.1962)). Publication can be established by either direct or circumstantial evidence. Melancon, 589 So.2d at 1189.
In this case, the Church Defendants contend that there was no evidence of publication. They contend that neither of the two events on which the trial court relied upon to find publication provide sufficient evidence. Those two events are as follows: (1) the Church Defendants’ January 2000 Lawsuit, and (2) the Fox 8 News Broadcast. We address the 2000 Lawsuit and the Fox 8 News Broadcast separately.

(1) The Church Defendants’ January 2000 Lawsuit

The Church Defendants contend that the trial court’s rebanee on the 2000 Lawsuit as publication of the defamation was misplaced because it was a privileged communication. In support, they cite La. R.S. 14:49, which provides:
A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations:
[[Image here]]
(4) Where the publication or expression is made by an attorney or party in a judicial proceeding.
The record does not support a finding that this privilege applies. In order for the privilege to apply, an otherwise defamatory statement must be “made in good lisfaith on any subject matter in which the person communicating has an *664 interest or in reference to which he has a duty, to a person having a corresponding interest or duty.” Toomer v. Breaux, 146 So.2d 723, 725 (La.App. 3d Cir.1962). In this context, “good faith” means having reasonable grounds for believing that the statement is true. Ward v. Sears, Roebuck & Co., 339 So.2d 1255, 1261 (La.App. 1st Cir.1976).
The trial court noted that “even after it was shown that Bank One’s error had caused the $50,000 CD to be credited to First Zion Baptist Church of New Orleans, defendants continued their efforts to oust Rev. Thompson from his position as pastor.” In fact, at an injunction hearing on October 29, 1999, the previous trial court judge informed the Church Defendants that Bank One had made a mistake with regard to the ownership of the CD and that the Church did not have a $50,000 CD in its name. Despite this information, the Church Defendants filed the Petition for Damages against Rev. Thompson and his wife on September 6, 2000.[5] Further, the 2000 Lawsuit was abandoned, as no pleadings were filed into the record since January 7, 2004.
The Church Defendants contend on appeal that the trial court’s decision was based on a mistake of fact and that their lawsuit and the Fox 8 News Broadcast had nothing to do with the $50,000 CD, but rather with questions about monies expended from the operating account. However, the trial court found that the Church Defendants “presented no evidence to show any discrepancies, or that money was missing or misappropriated.” While the 2000 Lawsuit did not [ ^specifically refer to the $50,000 CD as the funds that Rev. Thompson allegedly misappropriated, the trial court weighed the evidence and found that the Church Defendants filed the 2000 Lawsuit in an attempt to oust Rev. Thompson and to make it appear that he stole the $50,000 CD. Thus, the trial court found that the Church Defendants, in making the allegations in the 2000 Lawsuit, did not act in good faith and that the conditional privilege codified in La. R.S. 14:49[6] was inapplicable. As noted above, this court will not disturb the trial court’s factual findings in the absence of manifest error. We find no manifest error in the trial court’s factual findings.

(2) Uncalled Witness Rule

At trial, the Church Defendants presented the deposition testimony of one of the Church Defendants, Anthony Bridges. However, the other seven individual Church Defendants failed to testify. *665 In its reasons for judgment, the trial court cited the uncalled witness rule, stating “the court finds that the failure of the individual defendants to testify at trial creates a presumption that their testimony would have been adverse to their position.” We agree.
The Louisiana Supreme Court reaffirmed the viability of the uncalled witness rule in Driscoll v. Stucker, 04-589, pp. 18-19 (La.1/19/05), 893 So.2d 32, 47, stating:
An adverse presumption exists when a party having control of a favorable witness fails to call him or her to testify, even though the presumption is rebutta-ble and is tempered by the fact that a party need only put on enough evidence to prove the case. Safety Ass’n of Timbermen Self Insurers Fund v. Malone Lumber, Inc., 34,646 (La.App. 2 Cir. 6/20/01), 793 So.2d 218, writ denied, 2001-2557 (La.12/07/01), 803 So.2d 973. Explaining that adverse presumption, the Fourth Circuit recently noted “ ‘[w]hen a defendant in a civil case can by his own testimony throw light upon matters at issue, necessary to his defense and particularly within his own knowledge, and fails to go upon the witness stand, the presumption is raised and will be given effect, that the facts, as he would have them do not exist.’ ” Taylor v. Entergy Corp., 2001-0805 (La.App. 4 Cir. 4/17/02), 816 So.2d 933 (quoting Davis v. Myers, 427 So.2d 648, 649 (La.App. 5 Cir.1983)). This adverse presumption is referred to as the “uncalled witness” rule and applies “when ‘a party has the power to produce witnesses whose testimony would elucidate the transaction or occurrence’ and fails to call such -witness.” Id. (quoting 19 FRANK L. MARAIST, LOUISIANA CIVIL LAW TREATISE: EVIDENCE AND PROOF, § 4.3 (1999)).
As noted previously, because Rev. Thompson proved defamation per se, the elements of falsity and malice are presumed, but may be rebutted by the defendant. Costello v. Hardy, 03-1146, p. 14 (La.1/21/04), 864 So.2d 129, 140. As noted, we find no error in the trial court’s reliance on the uncalled witness rule to find that the Church Defendants failed to rebut this presumption of malice.[7]

(3) The Fox 8 News Broadcast

Because we find that each of the Church Defendants is liable for publishing defamatory words against Rev. Thompson through the filing of the 2000 Lawsuit 118and the uncalled witness rule, it is unnecessary to address whether the Fox 8 News Broadcast meets the publication requirement for defamation.[8]

(c) Injury

A plaintiff claiming defamation must present competent evidence of the injuries suffered. Costello v. Hardy, 03-1146, p. 14 (La.1/21/04), 864 So.2d 129,141. A plaintiff must also demonstrate that the defamatory statements were a substantial factor in causing the harm. Id.
The trial court found that Rev. Thompson was unable to pursue his voca *666 tion as a pastor of an established church.[9] Further, Rev. Thompson lost his health insurance and his pension, which were benefits that the Church provided to him. The trial court also stated that Rev. Thompson was in poor health and unable to find other work. We find no error in the trial court’s finding that Rev. Thompson has provided sufficient evidence of the injuries he sustained as a result of the defamation.
Accordingly, we find no error in the trial court’s finding that the Church Defendants are liable for defaming Rev. Thompson.
II. DAMAGE AWARDS FOR DEFAMATION
In the alternative, the Church Defendants contend that the trial court abused its discretion in calculating Rev. Thompson’s damage awards. Further, Rev. Thompson contends that it was manifest error for the trial court to fail to award | inMrs. Thompson damages for loss of consortium. We address each of these damage awards arguments separately.

(a) Special and General Damages

As noted at the outset, an award of damages in a defamation case is left to the great discretion of the trier of fact and should not be disturbed absent a showing of manifest error. Sommer, 97-1929 at p. 17, 758 So.2d at 934-35. The reviewing court must find that the trier of fact abused its discretion in awarding damages. “[T]he award must be so high or so low in proportion to the injury that it ‘shocks the conscience.’” Id. Further, the reviewing court must determine not whether the trier of fact is right or wrong, but whether the trier of fact’s conclusion is a reasonable one. Zito, 11-2382 at p. 4, 89 So.3d at 375. “If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Id.
Damages for defamation include both special damages and nonpecuniary or general damages. Connor v. Scroggs, 35,-521, p. 14 (La.App. 2 Cir. 6/12/02), 821 So.2d 542, 552. This court has held that general damages for defamation can include injury to reputation, personal humiliation, embarrassment, mental anguish, and suffering. Sommer, 97-1929 at p. 47, 758 So.2d at 948-49.
The trial court awarded Rev. Thompson $196,228.00 for back pay,[10] $120,246.00 for pastoral annual payment loss, $79,795.00 for fringe benefit loss, DnPlus cost and interest from the date of judicial demand.[11] The trial court additionally awarded Rev. Thompson general damages of $150,000, plus cost and interest from the date of judicial demand, against only the Church Defendants.
The trial court’s calculations were derived from Rev. Thompson’s expert economist, Shael N. Wolfson, Ph.D. Dr. Wolfson calculated the back pay, pastoral annual payment loss, and fringe benefits from May 5, 2000 until the date of trial, May 14, 2012. Dr. Wolfson determined that the *667 annual base for determining back pay was $26,000 per year, which was based on the approximately $500 per week that Rev. Thompson received from the Church. Further, Dr. Wolfson calculated the pastoral annual payment loss based on the $10,000 annual payment Rev. Thompson received from the Church. Lastly, Dr. Wolfson calculated the fringe benefits based on retirement rates of $264.00 per month and insurance rates of $289 per month.
The Church Defendants contend that in calculating the damage awards, the trial court failed to take into account the testimony and letter of Rev. Thompsons’s physician, Dr. Robert Quintal. In a letter dated August 15, 2006, Dr. Quintal opined that because of Rev. Thompson’s heart condition, he could no longer work as of August 2006.[12] Thus, the Church Defendants contend that the damage awards should be amended to exclude all damages after August 2006. However, Dr. | ⅞1 Quintal’s 2006 letter was not the only evidence admitted at trial regarding Rev. Thompson’s ability to work.
At trial, Dr. Quintal was questioned on direct regarding his opinion on whether Rev. Thompson could return to his pastoral duties despite his health condition. While Dr. Quintal testified that “[Rev. Thompson] is very involved in the community; and those are very stressful situations which I do not believe that he should be involved in,” he also testified that he “believe[d] that if he limits his activities to being a pastor, he could [return to work].” Dr. Quintal was also questioned on cross-examination regarding his opinion of whether Rev. Thompson could return to work today. Dr. Quintal responded that he could not make a judgment call regarding Rev. Thompson’s ability to work because he never heard him preach.
The record also indicates that Rev. Thompson was involved in several community organizations since 2006.[13] Considering Rev. Thompson’s active and continuous participation in these community organizations, it was reasonable for the trial court to find that he was also capable of his former pastoral duties at the Church.
Given Dr. Quintal’s trial testimony coupled with the evidence regarding Rev. Thompson’s active and continuous participation in community organizations, we find the trial court’s decision to award Rev. Thompson damages from 2000 to |⅞⅞2012 was reasonable. Thus, we find that the trial court did not abuse its discretion in calculating Rev. Thompson’s special damages.
Further, we find that the trial court did not abuse its discretion in its award of general damages. Rev. Thompson proved injury to his reputation, personal humiliation, embarrassment, mental anguish, and suffering. Thus, we find that an award of $150,000 for general damages for these injuries was not an abuse of the court’s discretion.

*668
(b) Loss of Consortium, Damages

Rev. and Mrs. Thompson contend in their appellee brief that it was manifest error for the trial court to fail to award Mrs. Thompson damages for loss of consortium. The appellees, however, failed to file their own appeal or to answer the Church Defendants’ appeal. See La. C.C.P. art. 2133.[14] Thus, the appellees’ claim for loss of consortium damages is not properly before this court.

DECREE

For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
DYSART, J., Dissents.
_JjI respectfully dissent from the majority’s conclusion affirming the trial court’s finding of defamation per se. First, I note that the trial court’s judgment is based on events which occurred after the petition was filed and which, therefore, cannot support the judgment.[1] More specifically, the Petition for Damages on Defamation and/or Negligence and For Injunctive Relief (“Petition”) was filed on October 22, 1999. The Petition alleged that on September 15, 1999, a special meeting of the church’s Trustee Board was called (at which some members of the church who were not on the Board of Trustees attended), at which time plaintiffs were “falsely accused ... of having improperly used funds belonging to [the church] for their own purposes.” The Petition further alleged that certain Trustees had Rev. Thompson removed as a signatory on the church’s bank accounts. It then alleged that at another meeting on September 27, 1999, Rev. Thompson was accused “of embezzlement of church fund” in that he “purchased a 1992 Certificate of Deposit with Bank One ... valued in an amount equal to $51,000 with church funds.”
1 gIt is these events which form the basis of the lawsuit. Plaintiffs alleged that, because of these events, Rev. Thompson “was treated with such contempt as being called a thief and liar,” and his character was undermined.[2]
The trial court’s judgment, as reflected in its Reasons for Judgment, is largely based on a finding that the defendants accused Rev. Thompson of a crime. The trial court cites Carter v. Catfish Cabin, 316 So.2d 517 (La.App. 2 Cir.1975) for the *669 principle that “[w]hen words impute a crime to another, they are defamatory per se.... ” However, the trial court’s Reasons for Judgment do not specifically articulate what “words” were stated by the defendants that “imputed” a crime to Rev. Thompson and upon which the court based its finding of defamation per se. A review of the Reasons for Judgment suggests that the trial court’s finding of defamation was based on two facts: (1) “[e]ven after it was shown that Bank One’s error had caused the $50,000 CD to be credited to [the church], defendants continued their efforts to oust Rev. Thompson from his position as Pastor” and (2) “[a]s previously noted, one member of the Deacon and Trustee Boards even resorted to making accusations of theft on a local TV news show.”[3]
The former finding, that the defendants continued their efforts to oust Rev. Thompson, clearly does not imply any accusations of criminal activity. The latter finding, that Rev. Thompson was accused of theft on a TV news show, relates to broadcasts that occurred after plaintiffs filed suit.[4] To the extent that the trial court’s judgment is based on the broadcasts, the judgment cannot stand. Under pLa. C.C. Pr. art. 891A, a petition must identify the parties and contain “a short, clear, concise statement of all causes of action arising out of, and of the material facts of, the transaction or occurrence that is the subject matter of the litigation.” Here, the original petition was limited to those facts arising prior to its filing and thus, the only issues before the trial court are those addressed by the Petition. As no amending petition was filed, the events arising after the Petition was filed cannot form the basis of the suit.
Setting aside these preliminary matters, I do not find that the record substantiates a finding of defamation per se. To prove defamation, “[a] ... claimant ... must establish the following elements: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury.” Wood v. Del Giomo, 06-1612, p. 4 (La.App. 4 Cir. 12/19/07), 974 So.2d 95, 98. Our jurisprudence reflects that “[d]efamation per se is proven if the evidence demonstrates that a party has called a person a criminal or accused that person of being a criminal and has published the statement.” Hornot v. Cardenas, 06-1341, p. 20 (La.App. 4 Cir. 10/3/07), 968 So.2d 789, 802.
In finding that plaintiffs proved defamation per se, the majority opinion’s reasoning extends beyond the trial court’s findings. The majority notes that “[t]he church Defendants accused Rev. Thompson of ‘embezzlement of Church funds’ and of being a ‘thief and a ‘liar’ in- front of other members of the Church.”[5] The majority’s focus, though, is primarily on the lawsuit that the defendants filed against Rev. Thompson and his wife in September, *670 2000 (the “Second Suit”).[6] | ¿While the trial court made note of the fact of the filing of the Second Suit,[7] it made no mention of it as part of the trial court’s reasons for finding defamation per se. Accordingly, the majority’s reliance on the Second Suit as evidence of defamation per se is misplaced.
Even if the trial court’s finding of defamation per se was based on the Second Suit, I disagree that the filing of the Second Suit constitutes defamation per se. While the Second Suit made general allegations that Rev. Thompson “misappropriated Church funds and used them for his own personal benefit” and that an audit of church property conducted after Rev. Thompson left the church resulted in a finding of missing church property, the lawsuit never mentioned the CD or referred to Rev, Thompson as a “thief.” Nor was there a judicial determination that the allegations of that Second Suit were false and the majoritys finding that “there was never any truth to the allegations” of the Second Suit is not supported by the record. As per this Court’s rationale in Kirksey v. New Orleans Jazz & Heritage Foundation, Inc., 12-1851 (La.App. 4 Cir. 2/27/13), 116 So.3d 664, a defamation suit also involving allegations of misappropriation of funds, the filing of the Second Suit does not constitute defamation per se. To hold otherwise would have a chilling effect on the right of individuals to petition the court for redress of an alleged grievance without fear of retribution.
Finally, turning to the trial court’s finding that a “member of the Deacon ... Board[ ] resorted to making accusations of theft on a local TV news show, I do not | jjfind that this is supported by the record and, even if Mr. Tedford accused Rev. Thompson of theft, his actions cannot be imputed to the church or the defendants.[8] As previously noted, in the Fox 8 News broadcasts, while he expressed dissatisfaction with Rev. Thompson, Mr. Tedford never referred to Rev. Thompson as a thief. More importantly, while Mr. Ted-ford is a deacon in the church, he is not an employee and he receives no pay from the church. Even if his statements defamed Rev. Thompson, he had no authority to speak on behalf of the church, as admitted by Rev. Thompson at trial:
Q. ... You referenced John Tedford. He was a deacon?
A. Yes, sir.
Q. He wasn’t on the board of trustees?
A. No, sir.
Q. He wasn’t head deacon?
A. No, sir.
Q. And to your knowledge, was he authorized by anybody at the church to go speak on T.V.?
A. No, sir.
Q. That would have been beyond the scope of what he should have been doing, right?
*671 A. Right, unless Mr. Bridges ordered him to. I don’t know.
The Louisiana Supreme Court indicated in Boulos v. Morrison, 503 So.2d 1, 3 (La.1987), the following as to an “agent’s” binding a principal:
An agent’s power or authority is composed of his actual authority, express or implied, together with the apparent authority which the principal has vested in him by his conduct. See Interstate Electric Co. v. Frank Adam Electric Co., 173 La. 103, 136 So. 283 (1931). As between principal and agent the limit of the agent’s authority to bind the principal is governed by the agent’s actual authority. As between the principal and third | fipersons, the limit of an agent’s authority to bind the principal is governed by his apparent authority
There is no evidence in this case that Mr. Tedford had either express or implied authority and accordingly, his statements in the Fox 9 News broadcasts cannot be imputed to the church.

. Bank One is not a party to the instant appeal. Subsequent to the trial, Bank One set-tied with the Thompsons.

. In April 2010, the trial court also denied the Church Defendants' motion for summary judgment. This court denied the Church Defendants' writ application seeking review of the denial of their motion for summary judgment.

. Rev. Thompson and Mrs. Thompson testified to the defamatory statements made by the Church Defendants, as laid out in their petition. However, in Anthony Bridges’ deposition testimony he denied making any defamatory statements against Rev. Thompson and Mrs. Thompson.

. The trial court, in essence, granted the Bank's motion for new trial and decreased the award for back pay by $116,412, which was Rev. Thompson’s wages that he earned from 2000 to 2002.

. Although it was filed after Rev. Thompson's petition for defamation, the 2000 lawsuit constitutes defamation. The 2000 lawsuit also further corroborates Rev. Thompson’s initial allegations that the Church Defendants made defamatory statements about him and published these statements to others in the community.

. La. R.S. § 14:49 provides:
A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations:
(1)Where the publication or expression is a fair and true report of any judicial, legislative, or other public or official proceeding, or of any statement, speech, argument, or debate in the course of the same.
(2) Where the publication or expression is a comment made in the reasonable belief of its truth, upon,
(a) The conduct of a person in respect to public affairs; or
(b) A thing which the proprietor thereof offers or explains to the public.
(3) Where the publication or expression is made to a person interested in the communication, by one who is also interested or who stands in such a relation to the former as to afford a reasonable ground for supposing his motive innocent.
(4) Where the publication or expression is made by an attorney or party in a judicial proceeding.

. Although the uncalled witness rule does not apply to Anthony Bridges, it can be inferred that the trial court found that Anthony Bridges' testimony did not rebut the presumption of falsity and malice with regards to his defamatory statements against Rev. Thompson in the petition.

. Given our findings that publication was established by the circumstantial evidence, we find it unnecessary to address the Church Defendants' contention that the trial court abused its discretion in admitting the Fox 8 News Broadcast, which they contend was irrelevant and overly prejudicial.

. The trial court did note that Rev. Thompson was able to work as an executive director of a social program; however, this was an unpaid position.

. The trial court originally awarded Rev. Thompson $312,640.00 for back pay. However, the trial court later amended the original award from $312,640.00 to $196,228.00, providing for a deduction of Rev. Thompson's earned wages in 2000, 2001, and 2002. Rev. Thompson earned approximately $25,667 in 2000; $39,000 in 2001; and $51,000 in 2002.

.The trial court allocated fault 30% to Bank One and 70% to the Church Defendants.

. The letter stated the following:
Rev. Norwood Thompson has been under may care since 1996. He has ischemic cardiomyopathy with an ejection fraction of 10%, nonamendable to further revasculari-zation. He also has an implantable cardiac defibrillator, severe hypertension, and renal artery stenosis. It is my opinion that Rev. Thompson is not capable of performing the tasks which will allow him to obtain gainful employment.

. At trial, Rev. Thompson testified that he was currently the president of the Southern Christian Leadership Conference and had served in this position for at least the past five or six years. Rev. Thompson also testified that he was the chairman of the Greater New Orleans and Jefferson Gun Buy-Back Program, and he recently became the chaplain for the New Orleans City Council.

. La. C.C.P. art. 2133(A) provides:
A. An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer. Additionally, however, an appellee may by answer to the appeal, demand modification, revision, or reversal of the judgment insofar as it did not allow or consider relief prayed for by an incidental action filed in the trial court. If an appel-lee files such an answer, all other parties to the incidental demand may file similar answers within fifteen days of the appellee's action.

. The record before this Court does not contain any supplements or amendments to the original lawsuit.

. I would note that the record clearly reflects that this litigation stemmed from the misinformation provided to the members of the First Zion Baptist Church of New Orleans by Bank One regarding the CD mistakenly attributed to the church. The members’ investigation of the church’s finances and their confronting Rev. Thompson at that time were reasonable given the information obtained from Bank One.

. The trial court’s reference here is to the Fox 8 News broadcasts that included interviews with John Tedford. The trial court mistakenly refers to Mr. Tedford as a member of the Trustee Board. All parties agree that Mr. Tedford was not a member of the Trustee Board; rather, he was only a member of the Board of Deacons.

. In those Fox 8 News broadcasts, Mr. Ted-ford never referred to Rev. Thompson as a “thief.” Nor did Mr. Tedford make any reference to the CD or Rev. Thompson’s misappropriation of church funds for his own benefit. The trial court’s finding to the contrary is misplaced.

.Again, in the Reasons for Judgment, the trial court’s only finding that Rev. Thompson was called a “thief” was in reference to the Fox 8 News broadcasts. The trial court made no other specific finding that Rev. Thompson was called a "thief."

.Indeed, in finding that the filing of the Second Suit amounted to defamation per se, the majority declined to address whether die Fox 8 News broadcasts constituted "publication to a third party,’’ commenting that because of the defendants’ liability for publishing defamatory words through the Second Suit, "it is unnecessary to address whether the Fox 8 New Broadcast meets the publication requirement for defamation.”

. The filing of this suit also occurred after the instant lawsuit was filed; much like the broadcasts, it was not part of the original petition and was not added to it. Accordingly, it too cannot form a factual basis for this suit.

. While other members of the Board of Deacons were named as defendants in this suit, Mr. Tedford was not. This seems likely since Mr. Tedford’s interviews with Fox 8 News took place after this suit was filed.